CHOUTEAU, *Appellant.* v. ALLEN.

1. **Deed.** A deed running in the name of the C. & F. R. R. Co., a corporation) as grantor and signed " M. Brayman, president C. & F. R. R. Co.; G. R. Teasdale, secretary C. & F. R. R. Co.," is the deed of the corporation.

2. **A Certificate of Acknowledgment** may be good without using the word "acknowledge." Words of equivalent import will be sufficient.

3. **Corporation:** DEFECTIVE EXECUTION OF POWER VALIDATED BY ACQUIESCENCE. If the officers of a corporation in undertaking to carry out a resolution of the board of directors requiring them to execute a conveyance of lands, convey a quantity in excess of that specified by the resolution, and there is no way of determining what lands are rightfully conveyed, and what wrongfully, the conveyance will, for this reason, be held fatally defective, but long acquiescence of the corporation, accompanied by acts of recognition on its part, will cure the defect.

4. **Misrecital of Statutory Authority.** Where two statutes authorized the county courts of certain counties to make certain subscriptions and to cause certain patents to be issued, one upon condition and the other without condition, and orders of subscription were made and patents were issued reciting the former act as the authority for making them, but it did not appear that the condition had been complied with; *Held,* that the orders and patents were, nevertheless, as valid as if they had recited the latter act.

5. **Title to Cairo & Fulton Railroad Lands:** FORECLOSURE OF STATE'S LIEN. The lands granted to the State of Missouri by the United States by the act of Congress of February 9th, 1853, (10 U. S. Stat., 155,) and by the State appropriated to the construction of the C. & F. R. R. by the act of the Legislature of February 20th, 1855, (Acts 1855, p. 314,) were subject to the lien reserved by the State in her own favor to secure the payment of the bonds issued by her for the benefit of that company, and passed to the purchaser at the foreclosure sale made in pursuance of the acts of February 19th and March 19th, 1866, (Acts 1866, pp. 107, 115).

The swamp lands which had been conveyed by the counties in payment of subscriptions to said company did not pass by said sale.

6. **Corporation:** NOTICE OF UNAUTHORIZED ACTS OF OFFICERS: EFFECT OF ACQUIESCENCE. Notice to the officers of a corporation of the unauthorized acts of their predecessors in office is notice to the corporation, and if no dissent is expressed, ratification will be presumed, and the acts will become binding upon the corporation and its stockholders.

7. **Pledge**: NOTICE OF SALE: WAIVER. It is the general rule that the pledgee of personal property, before selling, must demand payment of the pledger or give him notice of the time and place of the intended sale, but this rule may be waived by agreement between the parties, and it has no application in cases where by the contract a definite time is fixed for the payment of the debt. In either of these cases sale may be made without notice or demand.

8. **Pledge.** Where bonds are pledged as security for the payment of a note which is in turn pledged as security for the payment of acceptances, the time when the pledgee may sell the bonds is determined by the maturity of the note and not of the acceptances.

9. ————: SALE BY PLEDGEE TO HIMSELF. It is the general rule that a pledgee cannot buy at his own sale of the pledged property, but this rule may be waived by express agreement of the parties.

10. **Fraud.** Certain bonds claimed by the plaintiff in this case; *Held*, to have been fraudulently issued.

11. **Pledge** OF CORPORATE ASSETS BY DIRECTORS TO THEMSELVES. Any attempt by the directors of a corporation to make a pledge of the assets of the corporation in favor of themselves, will be scrutinized by a court of equity with the most rigorous and jealous observation.

12. **Bonds, when Non-negotiable.** A bond which, by its terms, is payable at a time certain, but contains a clause reserving to the makers "the right to pay the same at any time to be named by them, by adding to the principal a sum equal to twenty per cent. thereof," is non-negotiable for uncertainty as to the time of payment.

13. ————. Bonds with past due coupons attached are to be treated as dishonored paper.

14. **Principal and Agent**: AGENT'S KNOWLEDGE. The rule that the knowledge of the agent affects the principal, is applicable not only to knowledge acquired during the continuance of the agency, but to such as was acquired so shortly before it began as necessarily to give rise to the inference that it remained fixed in the mind of the agent during his employment.

15. **Statute of Limitations**: FRAUD: PLEADING: PLEDGE. The statute of limitations cannot be invoked in behalf of a title fraudulently acquired in violation of a trust, nor will it be allowed if it is not pleaded, nor does it run against a pledger as long as the pledge continues.

16. **Pledge**: ASSIGNMENT BY PLEDGEE. A pledgee can ordinarily convey no greater right to the pledged property than he himself possesses. If it is non-negotiable paper, it will be subject to the same defenses in the hands of the assignee as in his own.

17. **Parties**: CORPORATION: MORTGAGE. A stockholder of a defunct corporation has such an interest as entitles him to defend a suit brought to foreclose a mortgage alleged to have been executed by the corporation in its life-time. So has one who has acquired an independent title to part of the lands embraced in the mortgage.

18. **No Laches nor Acquiescence.** Under the circumstances of the present case, no laches can be imputed to the Cairo & Fulton R. R. Co. or its stockholders, nor such acquiescence as will preclude them from defending against certain bonds issued in the name of that company.

19. **Foreclosure of Mortgage**: PRACTICE AND PLEADINGS. If a party to a foreclosure proceeding in his pleadings claims the ownership of bonds secured by the mortgage, it is error to enter up a decree in his favor as pledgee.

20. **Railroad Construction Contract**: BRIBERY OF DIRECTOR. A construction contract is not void under sections 58 and 59 of the railroad law, (R. S. 1855, p. 438,) because the contractor has an agreement with a director of the railroad company to divide the profits of the contract with him. SHERWOOD, C. J., and NORTON, J., dissenting.

21. **Bonds**: ILLEGAL CONTRACT. Bonds issued in payment for work done under an illegal contract are not tainted with the illegality. SHERWOOD, C. J., and NORTON, J., dissenting.

21 **Foreclosure of Mortgage**: JURISDICTION. Since the circuit court has general jurisdiction over the foreclosure of mortgages, objection to the jurisdiction, based upon the fact that the mortgaged premises are not situate in the county where the suit is brought, must be taken by a proper plea, and will be waived by pleading to the merits.

*Appeal from Mississippi Circuit Court.*—HON. D. L. HAWKINS, Judge.

REVERSED.

This is a suit commenced in the circuit court of Mississippi county on December 16th, 1871, by Charles P. Chouteau, praying judgment upon certain alleged bonds and coupons of the Cairo & Fulton Railroad Company of Missouri, claimed to be owned by the plaintiff, and for foreclosure of a certain deed of trust alleged to have been executed by said company to secure said bonds and coupons, and covering lands in the counties of Stoddard, Scott,

Dunklin and Butler. The defendants are Thomas Allen, Henry H. Bedford, John Wilson, Mason Brayman, William H. Bailhache, Henry J. Deal, James H. Bethune, E. W. Hill, George Whitcomb, Joseph C. Moore, James M. Patterson, Green L. Poplin, Samuel Montgomery, James G. Nalle, Rudolph F. E. W. Webber, T. W. Johnson, James Clarkson and Henry E. Seelye.

The petition states in substance that the Cairo & Fulton Railroad Company, being engaged in the work of con-

Petition. structing their road through the counties of Stoddard, Scott, Dunklin and Butler, in order to raise funds for that purpose, issued 1600 bonds of $1,000 each, bearing date the 23rd of May, 1857, having twenty-five years to run, and having semi-annual interest coupons attached, and to secure the same executed the deed of trust sought to be foreclosed whereby 400,000 acres of land in said counties were conveyed to defendant Wilson and one John Moore and one Albert G. Waterman, as trustees; that this deed contained, among others, a provision which authorized the trustees, upon the surrender of any bonds for cancellation, to convey to the bondholder their value in land; that Moore and Waterman died, and in March, 1866, defendants Brayman, and H. H. Bedford were substituted as trustees in their places, and acted as such; that plaintiff is the owner of 706 of said bonds, (setting forth a list of them by their numbers;) that he had purchased them in good faith and for value in the market without notice of any defect in any of them and without any knowledge that said company denied their liability on any of them; that on the contrary, he fully believed that each and every one of said bonds and coupons was free of any defect, dispute or question; that he was induced to purchase them with a view and for the purpose of devising a plan for combining capital and personal influence in order to build and operate the railroad which had been commenced and was important to the people of southeast Missouri; that of the said bonds and coupons so owned by plaintiff he could only produce 125, of

which he made brofert; that plaintiff had placed the remaining 581 of his bonds in the hands of the board of land trustees to be converted into land, as provided in the deed of trust; that the said trustees had failed to convey any land to him, and the bonds were still in their hands, or if not, that they had been destroyed by them; that the company refused to pay any of the bonds or coupons or to make plaintiff any conveyance of land; that said railroad track, road-bed, rails, ties. depots, stations and all other fixtures and appurtenances of the railroad of said Cairo & Fulton Railroad Company, of Missouri, were sold by the State under the lien mentioned in said deed of trust; said sale was made October 1st, 1866, and said corporation was thereby dissolved; that Green L. Poplin, Samuel Montgomery, James G. Nalle, Rudolph F. E. W. Webber and T. W. Johnson were, at the time of said sale, the only directors and managers of said corporation, and said Poplin was president, and said directors are now trustees in law to wind up the affairs of said corporation; (1 R. S. 1855, p. 375, § 24;) that said company and said trustees made default in payment of interest upon said bonds so that said lands are subject to sale; that the defendants Deal and Bethune, by proceeding under certain judgments which were void, and others which were satisfied, caused executions to be issued in 1867 against said company, then dissolved, and levies to be made on the lands in said deed of trust, and purchased said lands at sheriff's sale and took sheriff's deeds therefor; that all said judgments, executions, levies, sales and sheriff's deeds were illegal, irregular, fraudulent and void; that said Deal and Bethune conveyed by quit-claim to Thomas Allen, who claims some interest in said lands under said sheriff's sales; that the defendants E W. Hill, Henry C. Seelye, James M. Patterson, Joseph C. Moore, James Clarkson and George Whitcomb claim to own some of the bonds secured by said deed of trust; that said Montgomery, Nalle, Johnson, Webber and Poplin refuse to act as trustees for said dissolved corporation and deny it is their

duty so to act. The plaintiff prayed that an account be taken of the bonds and coupons belonging to the plaintiff, and of any bonds, coupons or claims of any other person secured by said deed of trust; that plaintiff have judgment for his debt, the trust be foreclosed, lands sold to pay plaintiff, the pretended rights of Deal, Bethune and Allen be declared null, and for general relief.

The defendants Poplin, Montgomery, Nalle, Webber and Johnson answered, denying that they were directors
<span style="float:left">Answers.</span> of the company at its dissolution by the sale to the State on October 1st, 1866. Moore and Patterson answered setting forth their claim to ten bonds which they alleged were secured by said deed of trust and prayed judgment therefor. Deal and Bethune answered, admitting that they purchased the lands mentioned in the deed of trust and sold them to Allen; but averring that the judgments, executions, levies and sales were fair and valid. Hill and Clarkson answered, each claiming to be the owner of certain bonds and coupons, for which they prayed judgment and foreclosure. Seelye answered, claiming fifty-one bonds with their coupons, for which he prayed judgment and foreclosure.

Defendant Allen answered separately. His answer denies that said corporation at and prior to the time of ex-
<span style="float:left">Allen's answer.</span> ecution of said alleged deed of trust, was the owner of the lands mentioned, save and excepting that portion thereof the title whereto was derived by said corporation under and by virtue of the act of Congress entitled "An act granting the right of way and making a grant of lands to the States of Arkansas and Missouri to aid in the construction of a railroad," &c. Approved February 9th, 1853; and the acts and joint resolutions of Congress amending and extending the provisions of said act, and the acts of the General Assembly of the State of Missouri, accepting and passed in pursuance of the same. Alleges that the defendant is the owner of all said lands described in said original and supplemental deeds of trust, under and by

virtue of said act of Congress and acts of the General Assembly, before mentioned, and of conveyances from the counties respectively; that he is the owner of 17,520 shares of the capital stock of said company, and that only about 1,200 shares are owned by all other persons; that he also owns all the stock, property and interest ever held by the counties of Butler, Dunklin, Scott and Stoddard; and also all the claim, interest and estate which Henry J. Deal and James H. Bethune ever had in said property. Denies the execution and delivery of the bonds and deed of trust.

The answer further alleges that after the sale by the State to this defendant in 1866, the plaintiff combined and confederated with Bedford, Brayman, Bailhache and Webber to defraud the stockholders of said company, and this defendant, who was the owner of said lands and property, by corruptly, wrongfully and without the assent of said corporation, or of this defendant, procuring possession of said 581 bonds, and obtaining deeds of lands therefor, without any adequate consideration therefor to the company or to this defendant, from Bedford, Brayman and Wilson, who then assumed and pretended to be trustees of the lands under the deed of trust; that, in pursuance of such corrupt and fraudulent combination and purpose, the plaintiff paid to Bedford and Brayman $10,000 in cash, and thereafter he delivered to Brayman, who pretended to be and act as president of the board of land trustees, the 581 bonds mentioned in the petition as being in the possession of the trustees, and received five conveyances of lands in exchange for and in full payment, satisfaction and redemption of said bonds; that plaintiff had no right to said bonds, and said trustees no power or authority to execute said pretended conveyances; that each party to said fraudulent acts well knew of the wrongful and iniquitous conduct and purposes of all the others, and all equally participated in it.

As to the remaining 125 bonds, the answer alleges that they were never made nor issued by the company; that they

were wrongfully pledged by Brayman to Schuschardt & Gebhardt, of New York, to secure a note of Brayman for $12,000, given for money borrowed by him, individually; that the money for which the note was given and the pledge was made, was borrowed and used by Brayman personally, and not by or for the use and benefit of the company, and that the company never received any benefit from nor used any of said money, and did not in any manner authorize or ratify said pledging of said bonds, or any of them; that Schuschardt & Gebhardt, at the time of receiving said bonds knew that Brayman had no right to pledge the same; that afterwards the plaintiff bought said note of Brayman from Schuschardt & Gebhardt, and therewith received from them the 125 bonds, as collateral for the same, and not otherwise; that they never became the property of said original pledgees nor of plaintiff; that plaintiff well knew all of said facts when he bought said note and received said bonds, and now holds the note in his possession in full force against Brayman, and the bonds as collateral thereto.

Plaintiff's reply denies all the new matter set up in this answer.

On the 22nd day of September, 1857, the board of directors of the Cairo & Fulton Railroad Company, passed The deed of trust. a resolution authorizing the issuing of bonds to the amount of $1,600,000, and the execution of a deed of trust upon 400,000 acres of land to secure them, the bonds and deed to bear date May 23rd, 1857. Acting under this resolution the president and secretary of the company, on the 30th day of April, 1858, executed the deed of trust sought to be foreclosed. It is dated as directed, and purports to convey to Moore, Wilson and Waterman, as trustees, several hundred parcels of land, all described in a schedule attached to the deed. At the foot is the following declaration: "The foregoing schedule contains, according to estimate, 405,000 acres of land. The deed of trust, which is made to secure the payment of the bonds therein referred to, requiring a schedule of 400,000 acres

only, the surplus of 5000 acres is added to convey any deficiencies which may occur from errors of description, conflicting claims or other causes." The Cairo & Fulton Railroad Company is named in the body of the deed as grantor. The signature is as follows: "M. Brayman, President Cairo & Fulton Railroad Company, of Missouri; G. R. Teasdale, Secretary Cairo & Fulton Railroad Company, of Missouri."

The certificate of acknowledgment is as follows: "I, George W. Lowry, clerk of the circuit court of the United States for the southern district of Illinois, do hereby certify that on the 30th day of April, A. D. 1858, before me, at my office in the city of Springfield, in said State, came Mason Brayman, the president of the Cairo & Fulton Railroad Company, of Missouri, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as a party thereto, and who being by me duly sworn, deposes and says that he resides in the city of Springfield, in said State; that he is the president of the said Cairo & Fulton Railroad Company, of Missouri; that the seal affixed to the said instrument is the corporate seal of said company, and was affixed to the said instrument by authority of the board of directors of said company for the uses and purposes therein expressed, and that he by like authority did subscribe his name as president of said Cairo & Fulton Railroad Company, of Missouri. In witness whereof," &c.

*Certificate of acknowledgment.*

The deed was duly recorded in the counties where the lands lie during the years 1858 and 1859. It recites that said corporation proposed to issue and deliver, from time to time, as might be necessary for construction, furnishing and completion of the railroad, their bonds or obligations of even date therewith, and thereby to become indebted to divers persons, bodies politic or corporate, who should become holders of the same, in the sum of $1,600,000, secured to be paid by their sixteen hundred bonds of $1,000 each, to be paid on October 1st, 1882, and also interest for the

same at the rate of seven per cent. per annum, payable semi-annually, on April 1st and October 1st; and declares that it is executed to secure the payment of said bonds, and contains, among others, the following resolution: " Subject, however, with respect to said railroad, and every part and section thereof, and its appurtenances, to the prior, first and only present lien in the nature of a mortgage in favor of the State of Missouri, made to secure and indemnify said State against the payment of such bonds or obligations as said State may, from time to time, issue and deliver to the parties of the first part to aid in the construction of said road, under and by virtue of the provisions of two several acts of the General Assembly of said State of Missouri, entitled and approved as follows: " An act to expedite the construction of the Cairo & Fulton Railroad, of Missouri," passed December 11th, 1855; and also " An act to amend an act to secure the completion of certain railroads in this State, and for other purposes, approved December 10th, 1855;" approved March 3rd, 1857.

The bonds are in the following form: "This certifies that the Cairo & Fulton Railroad Company, of Missouri,
The bonds.      are indebted to————for money advanced for the construction of their railroad with its appurtenances, and that in consideration thereof, the said company do hereby promise to pay to————, or assigns, the sum of one thousand dollars, in the city of New York, on the 1st day of October, 1882, and also interest for the same from the 1st day of October, 1857, at the rate of seven per cent. per annum, payable on the 1st days of October and April in each and every year ensuing the date thereof, until said principal sum shall be paid, upon presentation of the annexed warrants as they severally become due; but the company reserve the right to pay the same at any time to be named by them by adding to the principal a sum equal to twenty per cent. thereof.      *      *      The lien upon said road is subject, however, to a first lien in favor of the State of Missouri, to secure the payment of $650,000; being for

bonds of said State loaned to said company to aid in the construction of said road."        *        *,

There was also introduced by the plaintiff a supplemental deed of trust, purporting to have been executed by the same corporation to the same grantees, as trustees, dated October 6th, 1858, conveying all lands of said company not included in the former instrument, for the purpose of securing payment of the interest of said sixteen hundred bonds. It was executed, acknowledged and recorded in the same manner as the first.

The lands conveyed by these deeds were of two classes: 1st, lands granted by the United States to the State of Mis-

*The Congress lands.* souri for railroad purposes, by an act of Congress entitled "An act granting the right of way," &c., approved February 9th, 1853, (10 U. S. St. at Large, p. 155). These lands were granted by the State to the company by act of the Legislature approved February 20th, 1855, (Sess. Acts 1855, p. 314;) 2nd, Swamp or overflowed lands. The act of Congress of September 28th, 1850, granted these last named lands to the State, (9 U. S.

*The Swamp lands.* St., p. 915,) for the purpose of being reclaimed. By an act approved March 3rd, 1851, (Sess. Acts 1851, p. 239,) the State donated them to the several counties in which they lie. By an act approved December 7th, 1855, the Legislature authorized the county courts of Scott, Dunklin, Stoddard and Butler, among others named, to transfer alternate tracts of swamp lands to the Cairo & Fulton Railroad Company, at not less than $1 per acre, payable in the stock of the company, "whenever a majority of voters petition them respectively to that effect." (Sess. Acts 1855, Adj. Sess., p. 353.) By an act approved December 10th, 1855, (Ib., 477, § 16,) the Legislature authorized the county court of any county in the State having swamp lands to subscribe the same as stock to any railroad which might pass through such county, upon such terms as might be agreed upon between the court and the company.

At various times subsequent to the 10th day of December, 1855, and prior to the 20th day of April, 1857, *Patents and orders of the county court.* each of these counties made subscriptions to the capital stock of the Cairo & Fulton Railroad Company payable in these lands, and on the latter the governor of the State, in accordance with the several orders of subscription, executed and issued patents direct to the company, as follows: For 47,084 acres in Scott county; for 95,595 acres in Dunklin county; for 100,868 acres in Butler county; for 127,277 acres in Stoddard county. The order of subscription by the Stoddard county court declared that there had been "a satisfactory showing that the citizens of this county are in favor of the subscription." This was the only evidence to show that a majority of the voters of Stoddard county had petitioned the court to make the subscription. The orders in the other counties contained no recital, and there was no evidence that any expression of the sentiments of the citizens of these counties had been taken. In every case the order of the court referred to the act of December 7th, 1855, above mentioned as the authority under which the subscription was made, as did the several patents issued by the governor.

The railroad company, in several of its annual reports, admitted the execution of these deeds of trust. Thus in *Company's Reports.* the report of December 1st, 1858, to the State Board of Public Works, it is said, "400,-000 acres of land are held in trust to secure $1,600,000 of bonds of the Company, John Moore, John Wilson and Albert G. Waterman, trustees, and by a second deed, 170,-000 acres stand to meet accumulating interest," &c. Again, in said report, occurs the following: "Bonds authorized to be issued, $1,600,000; principal secured by deed of trust on 400,000 acres of land, dated May 23rd, 1857. Interest provided for by similar deed on 170,507 93-100 acres, dated October 6th, 1858." Again, the report of November 19th, 1859, to the State Board of Public Works, states that lands

have been sold by the trustees. No act was done or step taken by the company or its stockholders looking to the disavowal of the deeds of trust and bonds until 1870, when Allen, having become the owner of the road and its appurtenances as well as a majority of the stock, brought a suit to settle the affairs of the company and have the deeds of trust set aside.

Prior to the execution of the deeds of trust, State aid had been granted to the company under two acts of the Legislature: 1st, "An act to expedite the construction of the Cairo & Fulton Railroad Company, of Missouri," approved December 10th, 1855; 2nd, "An act to amend an act to secure the completion of certain railroads," &c., approved March 3rd, 1857, (Sess. Acts 1857, p. 472). Under the first act $250,000, of State bonds, and under the second $400,000 additional were issued to the company. Section 17 of the latter act provides that "all bonds issued under the provisions of this act shall constitute a first lien or mortgage upon the road and property of the several companies receiving them." This is the lien in favor of the State which is referred to in the deed of trust.

The company having failed to comply with the terms of these acts, the "sell-out" act approved February 19th, 1866, directed sale of the road and "property of every description," &c., belonging to the company. The 8th section contained the following proviso: "*Provided,* That nothing in this act shall be so construed as to convey, or to authorize the commissioners to convey to the purchasers of the Cairo & Fulton Railroad, any of the lands subscribed by counties to the stock of said road." Under this act the governor advertised for sale at public auction the railroad and its appurtenances, and "all lands except the lands subscribed by counties to the stock of said road," and "all property and privilege which has been otherwise acquired by said company." The commissioners appointed by the act attended this sale on October 1st, 1866, and on behalf

*The State's sale.*

of the State became purchasers of the entire property at the full amount of the State's claim. The governor, thereupon, by deed dated October 12th, 1866, conveyed to the State of Missouri the railroad, "together with the appurtenances, rolling stock and property of every description, and all rights and franchises thereunto belonging." Under the supplementary act of March 19th, 1366, the commissioners re-advertised the road and property, and on the 8th day of November, 1866, sold the same to Joseph C. Reed and others. The governor, thereupon, conveyed to them the "road and all other property, real and personal, of every description, belonging or in any wise appertaining thereto, subject to all the conditions of the act of February 19th, 1866, and to the exception above referred to." The exception referred to is "excepting so much of the lands thereof as were exempted from sale by the terms of the act of the General Assembly of said State of Missouri, approved February 19th, 1866." The grantees in this deed conveyed to defendant Allen all the property conveyed to them by the State, by their deed dated January 12th, 1867.

Of the bonds claimed by plaintiff and alleged to be secured by the deed of trust, 125 were purchased by him from Schuschardt & Gebhardt, bankers of New York. The history of these bonds is as follows: On the 10th of March, 1858, the board of directors gave to Brayman, as president of the board, power to institute negotiations for funds, for carrying on the operations of the company, based on the security of its property or otherwise, also to execute and deliver bonds of the company in accordance with his iron contract. In April, 1858, the board gave Brayman, as president, general superintendence and control over the affairs of the company, including its landed and financial interests. April 12, 1860, Brayman borrowed for the company from Schuschardt & Gebhardt, $12,000, payable six months from date, and executed a note to Schuschardt & Gebhardt in the words and figures following: "Six months after date, I

*The Schuschardt & Gebhardt bonds*

promise to pay to Mr. M. Brayman, or order, twelve thousand dollars, for value received, at the Bank of New York, having deposited with Messrs. Schuschardt & Gebhardt as collateral security to sell the same at the brokers' board or at public or private sale or otherwise, at their option on the non-performance of this promise, and without notice, 125 mortgage bonds of $1,000 each, of the Cairo & Fulton Railroad Company, and hereby authorize and empower said Messrs. Schuschardt & Gebhardt to become the purchasers of said bonds in the case of default, to protect their interest.   M. Brayman, president Cairo & Fulton Railroad Company, of Missouri."

The 125 bonds were deposited with Schuschardt & Gebhardt on the same day.   The note was duly presented for payment, and protested for non-payment October 15th, 1860.   April 20th, 1860, Brayman made another instrument of writing in the words and figures following :

*Messrs. Schuschardt & Gebhardt, New York,*

GENTLEMEN:   I acknowledge to have received your letter of credit dated April 20th, 1860, for $12 000, say twelve thousand dollars, to be availed of in my drafts on you at six months after sight, to be issued and presented prior to 1st of May proximo.   I accept this credit and bind myself to place funds in your hands at least eight days prior to the maturity of any acceptance made by you in virtue of said credit, and as security I hereby hand you a stock note of the Cairo & Fulton Railroad Company, of Missouri, for $12,000, say twelve thousand dollars, dated April 12th, 1860, signed by me as president of the Cairo & Fulton Railroad Company, of Missouri, to my individual order, duly indorsed by me.   As security attached to said note are $125,000 first mortgage land grant bonds of the Cairo & Fulton Railroad Company, of Missouri, with full and complete power to sell the same in any manner you deem fit, without notice, and to purchase them yourselves to protect your own interest, said credit being for account

of the Cairo & Fulton Railroad Company, of Missouri. I further agree to pay over into your hands, in monthly installments, the net earnings of the Cairo & Fulton Railroad Company, which are to be credited on the note of said railroad company of $12,000 lodged in your hands as collateral security for this credit. I further agree to have a resolution of the board passed to the above effect, and to transmit you a certified copy of the same. I agree to pay you a commission of $2,000 on receiving your acceptance in virtue of this credit. M. Brayman, president Cairo & Fulton Railroad Company, of Missouri.

The company drew two drafts, one for $7,000, the other for $5,000, on Schuschardt & Gebhardt, which were accepted and paid by them. No part of the earnings of the company, nor any other funds, were ever placed with Schuschardt & Gebhardt to meet these, which matured and were paid October 24th, 1860. May 15th, 1867, the 125 bonds, after being duly advertised, were sold at public auction in the city of New York, at the usual place for such sales, for $7 per bond, Schuschardt & Gebhardt being the purchasers. On the 14th day of October, 1868, they sold the said bonds and the $12,000 note to plaintiff Chouteau for $12,000.

In a report made by the company December 1st, 1858, to the State Board of Public Works, it was stated that <span class="margin">Ratification of pledge to Schuschardt & Gebhardt.</span> "the company has issued bonds to the amount of $500,000, $347,000 of which are hypothecated and delivered on contracts, and $153,000 at par value are placed in the hands of agents for the use of the company." In the same report it was said that $191,000 company's bonds have been hypothecated for materials and rolling stock. Again, in the same report it was said: "There have been delivered on contract for iron $156,000; hypothecated for various purposes, $191,000." In the report of November 19th, 1859, occurs the following:

"LAND GRANT BOND ACCOUNT."

Authorized to be issued based upon 570,507$\frac{93}{100}$

acres of land, - - - - - $1,600,000.00

| | | | | |
|---|---|---|---|---|
| Amount executed, | - | - | - | - 1,300,000.00 |

| | | | |
|---|---|---|---|
| Delivered on contract for iron, | - | - | 162,000.00 |
| In hands of agents for negotiation, | - | - | 838,000.00 |
| Sold for cash and sundry payments, | - | - | 150,000.00 |
| On hand, - - - - - | - | - | 150,000.00 |

| | | | |
|---|---|---|---|
| Total issued, | - - - | - | $1,300,000.00 |

In a report made January 11th, 1861, it was stated that lands had been put in trust and bonds to the amount of 1600 had been issued upon them and 330 of these had been hypothecated to secure the following debts, viz:

| | | | |
|---|---|---|---|
| Springfield Fire & Marine Insurance Company, | | | $12,000.00 |
| Schuschardt & Gebhardt, New York, | - | - | 12,000.00 |
| M. K. Jessup & Co., New, York, | - | - | 2,800.00 |
| Humphreyville Manufacturing Company, Conn., | | | 2,300.00 |
| Harland & Hollingsworth, Del., | - | - | 2,400.00 |

And also hypothecated to George Whitcomb and J. L. Moore ten bonds to secure - - 1,500.00

On March 5th, 1861, a meeting of the board of directors was held in Bloomfield, and Kitchen, H. H. Bedford, A. M. Bedford, Green L. Poplin and D. B. Miller, directors, were present; and it was then and there "ordered that $20,000 be raised upon personal responsibility, for the purpose of paying the expenses necessary for laying the iron from Sikeston to Little river; and as an indemnity to the parties who raise the money, $900,000 of the land bonds of said company are hereby set aside and appropriated for that purpose, which indemnity is to be held sacred, to be applied to the payment of any and all sums that said parties may have to pay of the said $20,000, each party to receive the said bonds in proportion to the amount of money he may have to pay."

*Resolutions of the Board.*

June 13th, 1861, at a directors' meeting in Bloomfield, Kitchen, A. M. Bedford, Miller, H. H. Bedford and Poplin, were present. It was ordered that "whereas S. G. Kitchen, A. M. Bedford, D. B. Miller, H. H. Bedford and

Green L. Poplin borrowed of the Union bank of Missouri, $20,000, and expended the same in the construction of said road and the purchase of materials for said construction, it is, therefore, ordered and resolved by the board that 912 of the land bonds of the company of the denomination of $1,000 each, together with three large iron safes, are hereby pledged and placed in the possession of S. G. Kitchen, A. M. Bedford and H. H. Bedford, to secure all the said obligors in the amounts they each may have to pay of said $20,000 so borrowed, as before stated; and, whereas, said company is indebted to all of said parties above named in the amount of their accounts for services rendered, moneys expended and materials furnished for said road; it is, therefore, ordered that to secure the payment of all the above named accounts and amounts, the said above named bonds be turned over to them and applied sacredly and specially to that purpose." And all work on the road was discontinued that day by order of the board.

At a directors' meeting at the same place, June 17th, 1861, Kitchen, A. M. Bedford, H. H. Bedford and Miller, were present. The following claims were allowed by the board: To A. M. Bedford, $1,268.43; to S. G. Kitchen, $1,850 and $2,450; to H. H. Bedford, $2,828; to A. M. Bedford, $1,633; to Green L. Poplin, $1,200; and to D. B. Miller, $120. September 14th, 1866, at a meeting of the directors in Bloomfield, it was ordered that the following accounts be allowed: H. H. Bedford, $12,099.80; T. W. Johnson, $1,000.; Green L. Poplin, $4,760; A. M. Bedford and George Whitcomb, $15,000; D. B. Miller, $2,100; S. G. Kitchen, $8,000; E. W. Hill, $3,000; C. B. Crumb, $4,388. A resolution was then and there passed by the board reciting the order of June 13th, 1861, to secure certain parties for moneys advanced, and that the debts had increased and other debts existed, and the creditors were willing to receive bonds in payment at $100 a bond, and there being no other means of payment, it was then and there ordered that bonds be sold and transferred to parties

as follows, at the rate mentioned above: To A. M. Bedford and Geo. Whitcomb, 150 bonds; to H. H. Bedford, 120 bonds; to Green L. Poplin, 47 bonds; to Daniel B. Miller, 21 bonds; to E. W. Hill, 30 bonds; to C. B. Crumb, 44 bonds; to T. W. Johnson, 10 bonds; to Solomon G. Kitchen, 80 bonds.

There was evidence from which the court found that the 581 bonds claimed by Chouteau were part of the 912 issued

*The 581 Bonds.* to the parties named in the foregoing orders. They were purchased, with eight years past due coupons attached, by plaintiff, through defendant Webber, at a total cost of about $145,000. As to the connection of Webber with

*Webber's Agency.* the transaction, plaintiff testified that about the 7th or 8th day of December, 1866, Webber came to him and proposed to him to absorb the outstanding bonds of the Cairo & Fulton Railroad Company, and stated that if plaintiff would do so all the southeast counties would subscribe their surplus lands and create an organization for constructing a road from Belmont, by Bloomfield, to Indian Ford; that Webber said he was owner of some bonds and had contracted for others; that he (Chouteau) agreed to take these bonds at their cost to Webber; that he took Webber to his clerk, Belin, informed him of his agreement and directed Belin when Webber brought the bonds to purchase and pay for them; that on the 8th day of December, 1866, plaintiff wrote to Webber the following letter:

"*Dear Sir:* My sole object in purchasing the bonds of the Cairo & Fulton Railroad, of Missouri, is for no other purpose than to assist in creating a money fund in connection with the counties and land owners of southeast Missouri to construct a railroad from Belmont to Bloomfield; thence to a point connecting with the extension of the Iron Mountain Railroad. Should this project fall through, for any cause, under my contract, I will agree to surrender all of said bonds to the parties from whom they may be purchased, or to the several counties in interest, at their cost, with interest at the rate of ten per cent. per annum."

Plaintiff stated that on the 12th day of December, 1866, he left St. Louis for New York, and did not return till January 3rd, 1867; that in his absence Belin purchased for him from Webber 301 bonds; that prior to January 3rd, 1867, he had no knowledge of any defect in any of said 301 bonds; that after the purchase of the 301 bonds by Belin, he (Chouteau) purchased from Webber 280 more bonds; that when he purchased said 280 bonds he had no knowledge of any defect in them, but prior to the purchase of them he did have some suspicion of them inasmuch as the number exceeded the amount of bonds he had been induced to believe were in circulation. Immediately upon his return to St. Louis plaintiff wrote to Webber, calling his attention to the fact that the number of outstanding bonds seemed to be greatly in excess of a memorandum furnished plaintiff by Webber, and expressing a suspicion that the "stolen or illegal bonds were being shoved in." This letter led to an interview, in which Webber explained that he had been misinformed as to the number of the bonds, and stated that he had been assured by the president and directors of the board that they were legal bonds, and he would produce a certificate to that effect from the president and board. September 16th, 1867, Green L. Poplin, president of the company, wrote to plaintiff that he was instructed by the directors to say they recognized and vouched for the validity of the 581 bonds sold to him by Webber. *Per contra*, there was evidence from which the court found that the 581 bonds were all fraudulently issued. Of 119 of them it was shown that they came into the hands of S. G. Kitchen, under the order of the board of June 13th, 1861, as part of the 912 bonds pledged by that order, and remained in his hands until March, 1866, when he delivered them to one Rayburn, either in payment or as security for a debt due from him to Rayburn. December 20th, 1866, Rayburn sold them to H. H. Bedford, who sold them to Webber, from whom plaintiff obtained them.

Stoddard county was the owner of 6000 shares of

stock in the Cairo & Fulton Railroad Company. The de-
fendant, Allen, in December, 1870, purchased
these shares and took a transfer of them.
Dunklin county owned 4480 shares. In November, 1860,
one Miller having obtained a judgment against the county,
caused this stock to be sold under execution, and himself
became the purchaser. In 1869 his legal repres_ntatives
sold to Kitchen, who, in 1871, sold to Allen. The validity
of the conveyances by which Allen acquired the stock of
these two counties, was denied by plaintiff on grounds
which need not be stated. Scott county owned 1250 shares.
In August, 1870, Allen bought them, together with all the
swamp lands which had been subscribed by the county to
the railroad company. The conveyance was made on cer-
tain conditions to be performed by the grantee. No evi-
dence was offered to show that the conditions had been
complied with.

*Allen's Purchases of Stock.*

The General Assembly, by an "act in relation to swamp
and overflowed lands," approved March 10th, 1869, in
order to convey to the different counties a
complete title to the swamp lands, directed
patents to be issued embracing all the swamp or overflowed
lands lying within the limits of the several counties, "con-
veying thereby all the title and interest of the State, in
and to such lands, to the counties in which such lands may
lie." In pursuance of this act the governor, on the 29th
day of April, 1870, issued patents to the counties of Scott,
Stoddard, Butler and Dunklin, embracing all the swamp
lands included in the deeds of trust. On the 18th day of
August, 1870, the county of Scott conveyed to Allen all
of its swamp lands, being those conveyed by the deeds of
trust. On the 28th day of July, 1869, the county of Stod-
dard sold and conveyed all of its swamp lands, including
those conveyed by the deeds of trust, to Geo. W. Kitchen
and others, who conveyed to Allen. The defendant, Allen,
to show title in himself to the swamp lands, introduced in
evidence the following deeds: A deed dated September

*Allen's Purchases of Lands.*

15th, 1866, from the sheriff of Stoddard county to Banke, of the lands in that county, contained in the deeds of trust, upon a sale made September 11th, 1866, under an execution issued on a judgment in favor of Banke against the railroad company, rendered November 21st, 1863. A deed dated April 15th, 1867, from Banke, of the same lands, to Deal. Also a deed dated September 14th, 1867, from the sheriff of Stoddard county to Bethune and Deal, of parts of the same lands in that county, upon an execution sale, September 11th, 1867, under a judgment in favor of Crocker against the railroad company, rendered January 7th, 1867. A deed dated April 5th, 1867, from the sheriff of Scott county to Deal and Bethune, of the lands in that county described in the deeds of trust, upon execution sale made under a judgment rendered on January 13th, 1864, in favor of Cashman against the railroad company. A deed from the sheriff of Dunklin county to Deal and Bethune, dated September 6th, 1867, of the lands of that county embraced in the trust deeds, upon execution sale made under a judgment in favor of Stratton against the railroad company, rendered November 20th, 1862. A deed from the sheriff of Butler county to Bethune and Emerson, dated September 26th, 1867, of the lands in that county described in the trust deeds, upon execution sale under a judgment rendered November 21st, 1863, in favor of Stratton against the railroad company. A deed of the same lands from Emerson to Deal, dated January 18th, 1871. A deed from the sheriff of Butler county to McWilliams, dated September 26th, 1867, of the lands in that county described in the trust deeds, upon execution sale made under a judgment rendered November 21st, 1863, in favor of Stratton against the railroad company. A deed of the same lands from McWilliams to Allen, dated June 14th, 1871. Deeds from Deal and Bethune to Allen for all the lands included in the foregoing conveyances to them.

The history of the 51 bonds claimed by defendant Seelye, is as follows: In March, 1859, a construction con-

The Seelye Bonds. tract was made between the railroad company and Hiram S. Hamilton.    Sylvester Sexton was then, and during its continuance remained, a director and vice-president and superintendent of construction of the company—charged with general superintendence, and with the duty of certifying for payment all claims against the company for construction.    In this contract Sexton was, if not the sole contractor in fact, interested with Hamilton, and paid Hamilton a salary of $2,500 per annum for the use of his name in the contract, and as a cover for his interest. The contract specified $25,000 per mile as the amount to be paid for building and equipping the road, but the actual amount to be paid for the work was $20,000, it being agreed that the remaining $5,000 per mile should be divided between them.    Under this contract the bonds now presented by Seelye were delivered to Hamilton, and by Charles S. Hamilton delivered to Sexton, except, perhaps, one, which the court below found came from another source.    The bonds were sold by Hamilton, in 1861, to Stevens, who, in 1872, sold them to Seelye.

The cause was tried before the court, beginning July 24th, and the evidence was concluded August 12th, 1873.

On June 8th, 1875, the court rendered a decree, and found the issues as to the 581 bonds, against the plaintiff, The Decree Below. and as to said bonds dismissed the petition. As to the 125 bonds, the court found that plaintiff is the holder and owner of the $12,000 note made by the Cairo & Fulton Railroad Company payable to Schuschardt & Gebhardt, dated April 12th, 1860, and that plaintiff holds possession of said 125 bonds as pledgee thereof, and has an equitable lien thereon to secure payment of said note, for the amount of which, with the interest, amounting to $22,552, judgment was entered to be levied of the swamp lands.    As to fifty of the bonds claimed by defendant Seelye, designated by their numbers, his claim was dismissed, and judgment was rendered in his favor upon the remaining bond and eleven coupons claimed by him, amounting to $3,380.    As

to the ten bonds claimed by Moore and Patterson's administrator, the court decreed a lien in their favor as pledgees to secure a balance of indebtedness amounting to $2,070.30; and found all other issues against said defendants. As to the 120 coupons claimed by defendant Hill, the court found against said claim, and dismissed the same. The court found against defendant Clarkson upon his claim to bond No. 512, and dismissed the same.

The plaintiff and defendants Seelye, Moore, Bridges and Allen, severally filed motions for a new trial, all of which were overruled, exceptions were duly saved, and said parties respectively appealed. On June 18th, 1875, defendant Hill filed his motion for a new trial, which was overruled. In addition to the foregoing, other facts necessary to a complete understanding of the case, will be found stated in the opinion of the court.

*Glover & Shepley* for appellant.

Plaintiff's bonds may be divided into two classes; 1st, those, the title to which is supported by evidence of possession under the orders of the board of March and June, 1861; 2nd, those which do not appear to have been issued under those orders. As to the former, of which plaintiff owns 320, no question of notice can arise. These 320 include the 125 Gebhardt & Schuschardt bonds. As to the remaining 386 we insist the evidence shows plaintiff had no notice of anything to invalidate them.

1. There is nothing in the objection that the sale to Gebhardt & Schuschardt was void, because neither the $12,000 note nor the pledge was the act of the company. *Newport Man. Co. v. Starbid*, 10 N. H. 123; *Witte v. Derby Fishing Co.*, 2 Conn. 260; *Safford v. Wyckoff*, 1 Hill 11; *Farmers Bank v. Troy Bank*, 1 Douglas (Mich.) 457; *Moss v. Livingston*, 4 Comst. 208; *White v. Bond*, 16 Mass. 401; *McClellan v. Reynolds*, 49 Mo. 312; Abbott on Corp., p. 13, § 108; *Lazarus v. Shearer*, 2 Ala. (N. S.) 718; *Drake v. Fle-*

*wellen,* 33 Ala. (N. S.) 106; *Musser v. Johnson,* 42 Mo. 78; *Smith v. Alexander,* 31 Mo. 193; *Shuetze v. Bailey,* 40 Mo. 69; *Kochler v. Black,* 2 Black, 715.

2. There is nothing in the objection that the sale of 125 bonds by Schuschardt & Gebhardt was invalid without a personal demand on the company to pay the debt and a personal notice of the time and place of sale. By the ancient common law when a simple naked pledge of chattels was made without an express agreement for a sale, and the time for redeeming was indefinite, a demand of the money secured or notice to redeem, had to be made, and such notice or demand was to be reasonable; and in case of sale the pledger was entitled also to notice of time and place of the intended sale. But when on the contrary the time for paying or redeeming, and the right to sell was fixed by the contract of pledge, so that the parties were distinctly informed by mutual stipulations of their several rights and duties, no demand or notice were required. The contract of pledge waived them in advance. *Genet v. Howland,* 45 Barb. 565; 2 Hilliard on Mortg., (4 Ed.) § 38, top p. 609; 2 Kent Comm., (12 Ed.) 581; 2 Story on Contr., (5 Ed.) 33; *Ratcliff v. Davis,* Yelverton 178; 3 Salkeld 267; *Pothonier v. Dawson,* Holt, N. P. 383; 1 Smith Lead. Cases (4 Am. Ed.) 258; *Johnson v. Stear,* 15 Com. B. (N. S.) 330; *Bigot v. Cubley,* 15 Com. B. (N. S.) 701; *Delisle v. Priestman,* 1 Brown (Pa.) 186; *Cortelyou v Lansing,* 2 Caines' Cas. 200; *Garlick v. James,* 12 John. 149; *Castello v. City Bank,* 1 N. Y. Leg. Observer 25; *Vest v. Green,* 3 Mo. 219; *Perry v. Craig,* 3 Mo. 516; *Hendricks v. Robinson,* 2 John. Ch. 283; *Brown v. Ward,* 3 Duer 660; *Allen v. Dykers,* 3 Hill 594; *Dykers v. Allen,* 7 Hill 498; *Wilson v. Little,* 1 Sandf. Sup. Ct. 358; *Hyatt v. Argenti,* 3 Cal. 157; *Robinson v. Hurley,* 11 Iowa 410; *Ogden v. Lathrop,* 1 Sweeny (N. Y. Sup. Ct.) 650; *Milliken v. Dehon,* 27 N. Y. 372; *Davis v. Funk,* 39 Pa. St. 250; *Diller v. Brubaker,* 52 Pa. St. 502; *Bryson v. Rayner,* 25 Md. 424; *Md. Fire Ins. Co. v. Dalrymple,* 25 Me. 242; *Bryan v. Baldwin,* 7 Lansing 174; *Beatty*

*v. Sylvester,* 3 Nev. 228; *Wheeler v. Newbould,* 16 N. Y. 392.

3. The sale of the 125 bonds by Gebhardt & Schuschardt to themselves, is not void. *Milliken v. Dehon,* 27 N. Y. 364; *Diller v. Brubaker,* 52 Pa. St. 498; *Foster v. Goree,* 5 Ala. 428; Hill Trustees, p. 159; *Downes v. Grasebrook,* 3 Meriv. 208; *Elliott v. Wood,* 53 Barb. 285; *Saunderson v. Walker,* 13 Ves. 601; *Coles v. Trecothick,* 9 Ves. 234; *Hamilton v. State Bank,* 22 Iowa 306; *Hyatt v. Argenti,* 3 Cal. 151; *Dobson v. Racey,* 4 Selden 216; *Olcott v. Tioga R. R.,* 40 Barb. 179; *Bryan v. Baldwin,* 7 Lansing 174; *Brightman v. Reeves,* 21 Texas 70; *Wright v. Whitehead,* 14 Vt. 268; *Wright v. Smith,* 23 N. J. Eq. 106; *Medsker v. Swaney,* 45 Mo. 273; *Baltimore Ins. Co. v. Dalrymple,* 25 Md. 302; *Blood v. Hayman,* 13 Met. 231; *Pitt v. Petway,* 12 Iredell 69; *Robbins v. Bates,* 4 Cush. 104; *Edmondson v. Welsh,* 27 Ala. 578; *Scott v. Freeland,* 7 S. & M. 409; *Johnson v. Bennett,* 39 Barb. 237; *Hayward v. Ellis,* 13 Pick. 276; *Worthy v. Johnson,* 8 Geo. 236; *McConnel v. Gibson,* 2 Ill. 128; *Yeackel v. Litchfield,* 13 Allen 419.

4. The company's equity of redemption to the 119 Kitchen bonds has been extinguished by force of the statute of fraudulent conveyances. The record shows that these bonds were pledged to Kitchen, by the company, June 13th, 1861, and immediately went into his possession and remained there till he put them in Rayburn's possession. The use reserved by the company was the right to redeem from Kitchen, but there was no recording of any instrument reserving this use. Either Kitchen or Rayburn could, therefore, sell the bonds and pass the title. *Cook v. Clippard,* 12 Mo. 379; *Layson v. Rogers,* 24 Mo. 192; *Balke v. Swift,* 53 Mo. 85; *Travis v. Bishop,* 13 Met. 304; *Bryson v. Penix,* 18 Mo. 13; *Doe v. Allsop,* 5 Barn. & Al. 142.

5. If the company had any right to these bonds after the pledge was made to Gebhardt & Schuschardt in April, 1860, and to Kitchen in June, 1861, it was a right to redeem, a right to tender the money owing by the company,

and demand return of the property pledged. The right of action was open to the company as soon as the debts were due, that is October 15th, 1860, and June 17th, 1861. The company had no other right. An action for detaining or injuring any goods or chattels, including actions for specific personal property, is barred in five years. 2 Wag. Stat., pp. 917, 918. It is true there is no claim to redeem in the pleadings—of course there is no plea of limitation to such a claim. The effect of the time which has passed can only be considered by supposing defendant had filed a cross bill to redeem. If that should now be done, defendants would be barred by lapse of time. *Lockwood v. Ewer*, 2 Atk. 303; *Aggas v. Pickerell*, 3 Atk. 225; *McNair v. Lott*, 25 Mo. 182; *Keeton v. Keeton*, 20 Mo. 530; *Kane v. Bloodgood*, 7 John. Ch. 90; *Roberts v. Sykes*, 30 Barb. 173; *Waterman v. Brown*, 31 Pa. St. 161; *Perry v. Craig*, 3 Mo. 516; 2 Wag. Stat., 920, 921. August 26th, 1866, more than five years before the bringing of this suit, Kitchen came to a settlement with the company, and took 168 bonds, including the 119, in payment of his debt, the company having the right to redeem the same by paying the debt in thirty days.

6. The bonds sued on are negotiable instruments. *Morris Canal Co. v. Fisher*, 9 N. J. Eq. 667; *Mercer Co. v. Hacket*, 1 Wall. 83; *Chapin v. Vermont & C. R. R. Co.*, 8 Gray 575; *Bronson v. La Crosse R. R. Co.*, 2 Wall. 283; *Conn. Ins. Co. v. Cleveland R. R. Co.*, 41 Barb. 9; *Brainerd v. New York, &c.*, 26 N. Y. 496; 12 Redf. Railways, p. 531, § 6; *Ide v. Conn., &c., R. R. Co.*, 32 Vt. 297.

7. To defeat the title of Chouteau to the 386 bonds not issued under the order of June 13th, 1861, it must be shown that he either knew or believed they were bad when he bought them. Being a purchaser for value, the law only requires of him that he shall have acted in good faith. *Goodman v. Simonds*, 20 How. 364; *May v. Chapman*, 16 Mess & W. 355; *Murray v. Lardner*, 2 Wall. 110; *Raphael v. Bank of England*, 33 Eng. Law & Eq. 279; *Magee v.*

*Badger*, 30 Barb. 264; *Potter v. McDowell*, 43 Mo. 97; *Flagy v. Palmyra*, 33 Mo. 450. The fact that Chouteau gave for the bonds but a small part of their face value, does not make him any the less a *bona fide* holder. *King v. Thompson*, 9 Pet. 204; *Emerson v. Slater*, 22 How. 28; *Sturlyn v. Albany*, Langdell's Sel. Cas. Contr. 185; *Brooks v. Ball*, Langdell's Sel. Cas. Contr. 194; *Wilkinson v. Oliviera*, Langdell's Sel. Cas. Contr. 202; *Cadwallader v. West*, 48 Mo. 483; *Brown v. Penfield*, 36 N. Y. 473; *Bank v. McLeod*, 7 Moore 35; *Brooks v. Haigh*, 10 Ad. & Ell. 323. The bonds were sold for all that could be got for them, as the evidence shows. The sale was, therefore, not fraudulent. *Mercer Co. v, Hackett*, 1 Wall. 83; *Woods v. Lawrence Co.*, 1 Black 386; *Baily v. Smith*, 14 Ohio St. 396; *Bay v. Coddington*, 5 John. Ch. 58. Whatever was the character of the sale, by the board, September 14th, 1866, Chouteau had no knowledge of it when he purchased the bonds. The evidence puts this beyond question.

8. The deed of trust, May 23rd, 1867, is a genuine and legal act of the corporation. It was duly and legally acknowledged and certified and recorded. The execution of it was further proved by witnesses. It was repeatedly ratified and approved by the board and by the stockholders.

9. The sale under the State lien did not affect the lands granted by the State to the company.

10. The lands donated by the counties were not sold under the State lien. The governor undertook to convey them, but without authority of the act of 1866 under which the sale was made, and his act is, therefore, void. *State v. McKay*, 43 Mo. 594.

11. The sheriff's deeds to Deal and Bethune are void. The sales were all made on executions issued against the corporation in 1867, after it had ceased to exist.

12. It is too late for the stockholders now to deny the validity of the bonds. All the acts complained of as fraudulent or illegal, were done by the board of directors.

They pledged the bonds in 1861, delivered part to Kitchen and sold another part in October, 1866. These directors had power to bind the stockholders as their agents. A fraudulent act, supposing all these acts fraudulent, is good enough between the parties, and will stand forever, unless objected to. A man may assent to a fraud if he chooses. It is voidable, not void, and must be objected to in reasonable time. *Peabody v. Flint*, 6 Allen 52; *H. & St. Jo. R. R. Co. v. Marion Co.*, 36 Mo. 294; *Willoughby v. Comstock*, 3 Hill 389; *Barrett v. Schuyler Co. Ct.*, 44 Mo. 197; *Rogers v. Burlington*, 3 Wall. 667; *Buell v. Buckingham*, 16 Iowa 284; *Bank v. Dandridge*, 12 Wheat. 68; *Moran v. Miami*, 2 Black 724; *Bissell v. Jeffersonville*, 24 How. 287; *Supervisors v. Schenk*, 5 Wall. 772; *Zabriskie v. Cleveland*, 23 How. 400. Allen, as assignee of the stock of Scott county, is bound by the acquiescence of his assignor. *James v. Woodruff*, 10 Paige 541; *McCready v. Rumsey*, 21 How. Pr. 271; Ang. & Ames Corp., (9 Ed.) top p. 811; Abbott on Corp., p. 753.

*Thoroughman & Warren* for Allen.

1. The certificates of acknowledgment are insufficient. Wag. Stat., § 14, p. 275; *Cabell v. Grubbs*, 48 Mo. 353. Equity will not supply the deficiency. Story Eq. Jur., § 174; *Chauvin v. Wagner*, 18 Mo. 531; *Wannall v. Kem*, 51 Mo. 150.

2. The deeds are signed and acknowledged by "M. Brayman, president, &c., and not by or in the name of the corporation, and are not, upon the face, the deeds of the company. *Hatch v. Barr*, 1 Ohio 181; 1 Parsons on Contracts, 140; Abbott Dig. Law of Corp., p. 271, §§ 23, 24, 25, 26; *Brinley v. Mann*, 2 Cush. 337.

3. The resolution of September 22nd, 1857, only authorized the conveyance of 400,000 acres of land, while the deeds of trust purport to convey 405,000 acres. It is impossible to eliminate this excess. No means exist by

which it can be determined what particular tract described was authorized and what was unauthorized; hence the in - strument is absolutely void as a conveyance. Story on Agency, p. 106; Liverm. on Agency, p. 101, § 1; Sugden on Powers, (3 Ed.) Ch. 5; Com. Dig. Att'y, Ch. 5.

4. The whole evidence shows beyond question that the order of September 14th was an endeavor to divide up and dispose of the 912 bonds turned over by Brayman, in anticipation of the sale of the road on the approaching October 1st.

5. The order of June 13th, 1861, was actually and constructively a fraud upon the company. The pledgees named in it, even if there had existed the indebtedness in their favor, were the very persons who made the order, officers, agents and trustees of the company. They could derive no personal and exclusive benefits from their official positions, and the attempt to do so was void. Story's Eq. Jur., § 322; Jeremy Eq. Jur. pt. 2, p. 395; *Richards v. N. H. Ins. Co.*,43 N. H. 263; *T. & U. M. R. R. Co. v. Hudson*, 19 L. & E. R. 361; *Bedford R. R. Co. v. Bowser*, 48 Pa. St. 29.

6. Brayman had no authority from the company to make the $12,000 note, nor to hypothecate the bonds. He did not represent himself as having the power to make the arrangement, and they were informed that he did not have it, for in the letter accompanying the promissory note, he says: "I further agree to have a resolution of the board to the above effect, and to transmit you a certified copy of the same."

7. The sale by Schuschardt & Gebhardt was void for want of personal notice to the alleged pledger to redeem before the sale. Edwards on Bailments, pp. 250 251; *Wilson v. Little*, 2 Comst. 443; *Stearns v. Marsh*, 4 Denio 230; *Brown v. Ward*, 3 Duer 660; *Milliken v. Dehon*, 10 Bosw. 325; 2 Kent Com., 583; Story on Bailments, §§ 318, 345; *Markham v. Jaudon*, 41 N. Y. 235; *Luckett v. Townsend*, 3 Texas 119; Tyler on Usury, Pawns and Loans, 581, 594, 595, 596, 597. The fact that the note was payable at a

fixed date did not dispense with this notice or demand. It is held that personal notice to the pledger to redeem must be given in such cases as well as where the debt secured is payable immediately, and if the pledger cannot be found, and notice cannot be given him, judicial proceedings to authorize a sale must be resorted to. The waiver contained in the note itself was of notice of sale, not of notice to redeem.

8. In all the cases cited for the plaintiff the pledge was of property to secure payment of a note made by the pledger to the pledgee directly as payee. In this case the pledger does not deliver the note as evidence of the debt to the pledgee, but as collateral security, accompanied by the attached bonds to indemnify him against acceptances. The reason, no doubt, was because the contract of April 20th contemplated the payment of the net earnings of the railroad to the pledgees, in monthly installments, which would largely reduce if not fully pay the acceptances before maturity, and the amount so paid was to be credited on the note so "lodged as collateral security for the credit." At the time of the delivery of the note and bonds to S. & G., there was in fact no debt of any kind due to them; there was only a contingent liability, dependent upon failure of the company to meet such drafts as it might draw, and S. & G. accept out of the net earnings or otherwise. Hence the note was merely pledged—not delivered to them as payees.

9. Plaintiff claims ownership of the bonds, not a lien as bailee or pledgee. He must recover on the case he makes in his pleadings, or not at all. The decree allowing him to come in as pledgee of the 125 bonds is, therefore, erroneous.

10. The bonds are not negotiable in form. Wag. Stat., § 15, p. 215; Edwards on Bills, pp. 60, 61, 126, 155, 164, 165; Story Prom. Notes, p. 10; Byles on Bills, p. 132; Chitty on Bills, p. 108; *Goodman v. Simonds*, 20 How. 359; 2 Redfield on Railways, p. 604; *White Vt. & Mass. R. R.*

*Co.*, 21 How. 575; *Morris Canal Co. v. Fisher*, 9 N. J. Eq. (1 Stockton) 667; *Chapin v. V. & M. R. R. Co.*, 8 Gray 575; *Delafield v. Illinois*, 2 Hill (N. Y.) 177; *Carr v. Le Fevre*, 27 Pa. St. 418; *Craig v. Vicksburg*, 31 Miss. 216; *Brainard v. N. Y. & H. R. R. Co.*, 25 N. Y. 496, (10 Bos. 332); *Bronson v. La Crosse R. R. Co.*, 2 Wall. 283; *Ide v. Conn. & Pass. R. R. Co.*, 32 Vt. 298; *Hubbard v. R. R. Co.*, 36 Barb. 286; 1 Daniel on Negotiable Insts., p. 41; *Way v. Smith*, 111 Mass. 523; *Hubbard v. Mosely*, 11 Gray 170.

11. Chouteau's means of information as to the history of the bonds and his knowledge of the facts, are such as to destroy his claim to be considered an innocent holder. Story on Bills, §§ 194, 216; Chitty on Bills, (11 Ed.) p. 256 *et seq*; Bayley on Bills, (5 Ed.) p. 548; Story on Prom. Notes, § 197; *Goodman v. Simonds*, 20 How. 343; *Cass Co. v. Green*, 66 Mo. 500; *Moore v. Moore*, 39 Iowa 461; Wade on Notice, § 88, p. 44; *Horton v. Bayne*, 52 Mo. 531; *Hamilton v. Marks* 52 Mo. 78; *Hamilton v. Marks*, 63 Mo. 167.

12. Coupons for interest, eight years over due, were attached to each and every bond, which was thus dishonored on its face. *First National Bank v. Scott Co.*, 14 Minn. 77; *Arents v. Commonwealth*, 18 Grattan 750; *Newell v. Gregg*, 51 Barb. 263; *Vinton v. King*, 4 Allen 562.

13. Plaintiff does not come with clean hands, and equity will leave him in the situation in which he placed himself, with his bonds, whatever their character, surrendered, canceled and annulled. 1 Story Eq. Jur., § 298, *et seq*; § 322; *Campbell v. Walker*, 5 Ves. 678, 680; *Hamilton v. Wright*, 9 C. & F. 111, 123.

14. The statute of fraudulent conveyances is inapplicable to the Rayburn bonds. The first clause, section R. S. 1855, p. 803, relates to possession of personal property under a pretended loan for a longer period than five years. These bonds were not borrowed by Kitchen or Rayburn. The second clause relates to possession as owner of personal property, where there is a reservation or condition in favor

of another, which is not of record. The bonds were held under the order of June 13th, 1861, by Kitchen in pledge, not as owner. *Cook v. Clippard*, 12 Mo. 379; *Layson v. Rogers*, 24 Mo. 192; *Balke v. Swift*, 53 Mo. 85; *Bryson v. Penix*, 18 Mo. 13; *Travis v. Bishop*, 13 Met. 30; *Doe v. Allsop*, 5 Barn. & Ad. 142.

15. The statute of limitations does not give plaintiff title to either the 119 Kitchen bonds or the 125 S. & G. bonds. 1st, Because it is not pleaded. *Benoist v. Darby*, 12 Mo. 196; 1 Chitty Pl., p. 472. 2nd, Because the statute does not run against an express trust, such as a pledge. Angell on Lim., (5th Ed.) p. 164; *Slaymaker v. Wilson*, 1 Pa. 216. If a stipulated time is fixed for the payment of the debt, and the debt is not paid at the time, the absolute property does not pass to the pledgee. If the pledgee does not sell, he still retains the property as a pledge, and upon a tender of the debt, he may at any time be compelled to restore it, for prescription or the statute of limitation does not run against it. The pawner has his whole life to redeem. 1 Story on Bails., 235; Edwards on Bails., 268, 222; Angell on Lim., 164; *Cortelyou v. Lansing*, 2 Caine's Cas., 200; 2 Kent's Comm., (3 Ed.) 583.

16. The construction contract of Hamilton with the company was void, both at common law and under sections 58 and 59 of the railroad law, (R. S. 1855, p. 438). It is, therefore, no legal consideration for the bonds, which are, therefore, void. Story on Prom. Notes, § 189.

It is claimed that although the contract was void, the company received work under it, and were bound in law to pay for it, and that the company waived any objections to the contract and settled with Hamilton. The attempt is to confound the right of Sexton or Hamilton to recover on a *quantum meruit* for work done, with the right of recovery on the bonds, which were issued under the contract. The contract provided for the issue of these bonds, and they were issued under it by Brayman, who was a party to it; their delivery was not only a fraud at common law, but in violation of the statute, and the company had no

power to waive objections to such violation, if it had ever done so, which is untrue. The delivery of the bonds was not a settlement of the claim; they were promises to pay money, the consideration of which was the void contract in pursuance of which they were issued, and of which they formed a part.

*Henry E. Seelye pro se.*

1. If sections 58 and 59 were applicable to this corporation, they could not affect these bonds. This claim is not based upon the construction contract, but upon bonds of the company dated nearly two years before that contract was made or thought of. They are not the contract prohibited and denounced by the statute. That statute at most could only be used to show that the construction contract was void. Independent of this statute there is no objection to a director or officer of a corporation contracting with it. 1 Speers Eq., 562; 1 Pick. 297; 5 How. 665; R. M. Charl. 260.

2. The 51 bonds if given to Hamilton in settlement of the work and labor done upon the company's road would not be void. There was nothing illegal in the building of the road. If the construction contract could not be enforced, nevertheless the company received his work, and were bound in law to pay for it; and the company waived any objections to the contract, and settled with Hamilton, paying him in their general securities, and thus changing their status with him from what it was on the construction contract into the bonds; and they cannot now go back of this adjustment and waiver and plead that the original contract was illegal. A contract illegally entered into may be so far executed by the parties, that it is considered purged of its illegality. It is well settled that if the matter has been so adjusted that the plaintiff can make out his case without being compelled to refer to or prove the illegal contract, he can recover. *Roby v. West*, 4 N. H.

290; *Thomas v. Brady*, 10 Barr 164; *Scott v. Duffy*, 14 Pa. St. 18; *Lestapies v. Ingrahim*, 5 Pa. St. 81; *Casady v. Woodbury Co.*, 13 Iowa 121; *Fisher v. Bridges*, 2 Ellis & Black. 126; *Buck v. Albee*, 26 Vt. 184; *Gwinn v. Simes*, 61 Mo. 335.

SHERWOOD, C. J.—Our first point of inquiry will be as to the validity of the deeds of trust, which the plaintiff seeks to foreclose, because, if no title passed by such deeds it would be altogether futile to make further inquiry.

We discover no objection either to the form of these deeds or their respective certificates of acknowledgment, 1. DEED.     since it clearly appears that the Cairo & Fulton Railroad Company is the grantor, and the corporate seal is duly affixed by the president of the company. Deeds far less formal than these have been regarded as sufficient by this and other courts. *McClure v. Herring*, ante, p. 18, and cases cited.

As to the certificates of acknowledgment, although they do not contain the word "acknowledge," yet they do 2. A CERTIFICATE contain words of equivalent import, and this OF ACKNOWLEDG-MENT.     is sufficient. The case before us is consequently totally unlike that of *Cabell v. Grubbs*, 48 Mo. 353, and the ruling in that case of course inapplicable.

It is also claimed that the first deed of trust is inoperative, because the resolution of September 22nd, 1857, only 3. CORPORATION: authorizes the conveyance of 400,000 acres defective execution of power validated by acqui-escence. convey 405,000. The authorities cited certainly seem to establish that in the execution of powers where the boundaries between the excess and the rightful execution are not distinguishable, there the whole will be void. Story on Agency, § 166; and cases cited. Here it would not be possible to eliminate the excess, to determine where the rightful exercise of the power conferred ceased, nor where the wrongful exercise of power not conferred

But notwithstanding this defect, which, under certain circumstances, must be regarded as a fatal one, we think such defect as well as the others alleged to exist as to both deeds, cured, because of the acquiescence of the directors and stockholders of the Cairo & Fulton Railroad Company in the execution of the deeds for years after they were put to record. And besides, that company gave recognition to those deeds in an almost infinite variety of ways, as the record abundantly discloses. There is no lack of authority to show that such acts of acquiescence and recognition bind the company, its officers and its stockholders, as thoroughly as though the instruments in question were executed with the most rigid observance of all the technical formalities known to the law. *Hoyt v. Thompson*, 19 N. Y. 207; *Peabody v. Flint*, 6 Allen 52; *Woodbridge v. Proprietors*, 6 Vt. 204; *Enders v. Public Works*, 1 Gratt. 364; *Walworth v. Farmers*, 16 Wis. 629; *Gordon v. Preston*, 1 Watts 385.

In the case last cited, Gibson, C. J., in delivering the opinion of the court, said: "It is equally clear that the mortgage did not originally bind the corporation. It was executed not on a charter day, or a day appointed by a by-law, but at a special meeting convened without notice, written or verbal, to the directors who did not attend. When a day has not been fixed by other competent authority, this notice is indispensable to a legal convention for the transaction of even ordinary business.   *   *  But can the act be impugned now? A corporation can contract but by its agents, general or special; and in pursuance of powers delegated specially by its grant to particular persons, or generally, by its charter, to the officers intrusted with its affairs. Hence, the members of this board stood in relation to it as servants whose acts may be disaffirmed for defect of authority, but by their master. But the maxim which makes ratification equivalent to a precedent authority, is as much predicable of ratification by a corporation, as it is of ratification by any other principal, and it is equally to be presumed from the absence

of dissent. Now the validity of this mortgage is unquestioned by the corporation even at this day, though its existence has all along been known to the corporate officers, whose duty it was to disavow it had there been an intent to contest it. The corporation then being satisfied with it, who has the right to object?" These remarks are directly applicable to the case at bar, and leave no room to question the validity of the deeds of trust, nor that those conveyances passed to the trustees therein named whatever title was then possessed by the Cairo & Fulton Railroad Company.

There is no question that so far as the Congress lands are concerned, i. e., those granted by the United States to the State of Missouri by the act of February 9th, 1855, the Cairo & Fulton Railroad Company had a title thereto when the trust deeds were executed. Indeed, the answer of Allen admits as much. So that the inquiry is narrowed down to the point whether the title of the swamp or overflowed lands was in that company at the time those deeds were executed, the respective dates of their execution being April 30th, 1855, and October 6th, 1858. It is claimed on the part of the defendant, Allen, that inasmuch as the patents executed by the State of Missouri to the Cairo & Fulton Railroad Company recite that the county courts of the counties of Scott, Dunklin, Butler and Stoddard had under the act of December 7th, 1855, transferred the swamp lands mentioned in such patents to that company, and inasmuch as the orders of transfer of the dates specified in the patents do not set forth that in accordance with the provisions of that act a "majority of the voters" of each county had petitioned the county courts of their respective counties to make such transfer; that the non-compliance with this statutory condition precedent prevented any title from passing by such patents There would appear to be much force in this claim that the county courts, acting under a special statutory authority, would have to spread upon their records

**4. MISRECITAL OF STATUTORY AUTHORITY.**

evidence of having complied with such authority, in order
to give their act of transfer any legal force or validity. A
majority of the court are, however, of opinion that in con-
sequence of the act of December 10th, 1855, in relation to
the completion of certain railroads in this State, not con-
taining any such restriction as that above mentioned, but
permitting any county court of any county in this State
possessed of swamp lands, to " subscribe the same as stock
to any railroad," &c., therefore the orders of transfer were
as fully valid as if the patents had referred to the act of
December 10th, 1855, instead of to the act of the prior
date.

Having ascertained that the lands specified in the deeds
of trust passed by those conveyances, we are next to con-
5. TITLE TO CAIRO sider what lands passed to the defendant
& FULTON RAIL-
ROAD LANDS: fore- Allen, by reason of the sale which occurred
closure of State's
lien.         October 1st, 1866, under and by virtue of
what is commonly designated as the " sell-out" act of Feb-
ruary 19th, 1866, amended by the supplementary act of
March 19th of the same year.   So far as respects the " Con-
gress lands," described in the deeds of trust, it has been
held that they passed in consequence of the sale which
occurred October 1st, 1866, and which was but the fore-
closure of the first lien and statutory mortgage held by the
State over all the property of the company.   *Whitehead v.
Vineyard*, 50 Mo. 30; *Wilson v. Boyce*, 2 Otto 320.

But by the express terms of section 8 of the act first
referred to, it is provided that:  "Nothing in this act shall
be so construed as to convey or to authorize the commis-
sioners to convey to the purchasers of the Cairo & Fulton
Railroad any of the lands subscribed by the counties to the
stock of said road."  This express reservation of lands of
this description would entirely preclude them from passing
by the sale or by the conveyance made by the governor,
his acts and his conveyance being in entire subjection to
the familiar rule which confines a special agent within the
precise limits of his delegated authority.  We hold then,

that the land donated by the counties to the Cairo & Fulton Railroad Company, or subscribed as stock to said road, did not pass, nor were they intended to pass by the conveyances of either the governor or the commissioners; thus leaving these lands fully subject to the lien of the deeds of trust, from which lien the "Congress lands" were exempted by reason of the sale of October 1st, 1866. The title of Allen to the "Congress lands" must, therefore, be regarded as free from flaw.

We pass now to the consideration of the bonds held by plaintiff, and as to the nature of his rights respecting 

6. CORPORATION: notice of unauthorized act of officers: effect of acquiescence.

them. And first, as to the 125 bonds purchased by him of Schuschardt & Gebhardt; much has been said by counsel respecting the negotiability of these bonds. We do not regard the negotiability or non-negotiability of these bonds as exercising any controlling influence in the case. If Brayman had the authority to pledge the bonds, that is an end of the matter. If, on the other hand, he possessed no such authority, then unless his act was assented to in some way, it has no validity. But we think such assent, either directly or indirectly, has been manifested. These bonds were pledged by Brayman April 20th, 1860, to Schuschardt & Gebhardt, to secure a debt of $12,000. In the report made January 11th, 1861, to the Board of Public Works, by H. H. Bedford, one of the directors of the Cairo & Fulton Railroad Company, a statement is made that 330 of the bonds of the company had been hypothecated to secure a number of debts which are specified, among them that of "Schuschardt & Gebhardt, New York, $12,000." Accompanying that report is the agreement dated January 8th, 1861, therein referred to, entered into between Brayman, the retiring president, and Kitchen, the vice-president, and H. H. Benford, director of the company, whereby Brayman is to be "saved harmless from all his indorsements or personal liabilities on account of said company." In the conclusion of that agreement are mentioned the liabilities

. specified in the report, including that to "Schuschardt & Gebhardt, New York, with interest, $2,000." The company were thus apprised, at least as early as the date of the agreement, which we may fairly infer was soon thereafter, deposited among its official papers, that the debt to Schushardt & Gebhardt, of New York, existed; that Brayman had, "on account of the company," created the debt and had pledged to the firm mentioned the bonds of the company to secure the payment of such indebtedness. Matters stood in this condition until May 15th, 1867, when Schuschardt & Gebhardt, under the power conferred by the written instrument signed by Brayman, president of the Cairo & Fulton Railroad Company, which accompanied the delivery of the note and bonds by Brayman, sold the bonds at public auction and bought them in for themselves. If these facts are indicative of acquiescence in and recognition of the acts of Brayman, then those acts must be deemed as recognized and ratified in their fullest extent by the Cairo & Fulton Railroad Company. If so, then the authorities heretofore cited in respect to acquiescence in the deeds of trus are to be held equally applicable in the present instance. Here the corporation was directly notified through its officers and servants of Brayman's act, and opportunity afforded to either reject or ratify that act. In the absence of any expressed dissent, ratification must be presumed, and notice to and ratification by the corporation cannot be deemed as anything else than notice to and ratification by the component elements of the corporation, *i. e.*, the stockholders; any other rule than this would possess the element of absolute impracticability. This being true, we are to treat this case as if Brayman had a precedent authority for making pledge of the bonds.

Proceeding upon this as the basis of investigation, the inquiry arises, was notice to the pledger under the circum-

7. PLEDGE: notice of sale: waiver. stances presented by the record, a condition precedent to a valid sale of the pledge by the pledgees? It is to be observed that the note executed

by Brayman, as president of the Cairo & Fulton Railroad Company, to Schuschardt & Gebhardt, in reference to the bonds pledged, uses this language: "With authority to sell the same at the brokers' board or at public or private sale, or otherwise, at their option, on the non-performance of this promise, and without notice." And the agreement also executed by Brayman, as president, &c., to the above mentioned firm, has the following: "As security attached to said note are $125,000 first mortgage land-grant bonds of the Cairo & Fulton Railroad Company, of Missouri, with full and complete authority to sell the same in any manner you may deem fit, without notice, and to purchase them yourselves to protect your own interests." It must be admitted that language possessing a broader or more comprehensive significance than this, could not easily be employed. Did it dispense with and obviate notice to or demand of the pledger to redeem prior to sale?

Numerous authorities have been cited for the defendant, Allen, as showing that this agreement did not and could not have that effect. We do not regard any of these authorities as going so far. There is no doubt as to the general doctrine that notice to, or demand of, the pledger is necessary before sale, in the case of a mere naked pledge where no definite time of payment is fixed. Judge Story says. "The common law of England existing in the time of Glanville, seems to have required a judicial process to justify the sale, or at least to destroy the right of redemption. But the law as at present established, leaves an election to the pawnee. He may file a bill in equity against the pawner for a foreclosure, or he may proceed to sell *ex mero motu*, upon giving due notice of his intention to the pledger." Story on Bailment, § 310. But the learned author is careful to say that: "In speaking of sales by the pledgee, it has been assumed that there is no special agreement between the parties as to the time or mode of sale, nor any stipulation wholly interdicting any sale. If any

such agreement exist, it must ordinarily regulate the rights of both parties." Ib., § 317.

The case of *Stearns v. Marsh*, 4 Denio 230, was shortly this: " The pledgers executed their note July 5th, 1837, payable in four months, and pledged for its payment ten cases of boots and shoes; a few days thereafter the pledgers authorized the pledgees to sell certain of those cases, (Nos. 5, 6 and 7,) at a public sale about to occur at Rich's on the 19th day of July, and to apply the proceeds on the note This privilege the pledgees did not avail themselves of, but on the 15th of the following November, without any notice to the pledgers, caused the sale of the goods at Rich's at public auction, indorsed the proceeds on the note, and brought suit against the pledgers for the balance due on the note, and a plea of *non-assumpsit* was pleaded. This sale was characterized as a *tortious* one, and the pledgees as wrong-doers. But in that case there was no agreement dispensing with notice, either of time or place of sale, no power of sale conferred and no time fixed by the contract of pledge when redemption was to occur. The case of *Wilson v. Little*, 2 Comst. 443, was one where the note was payable immediately. " I promise to pay Jacob Little, or order, $2,000." This note was virtually payable on demand, and in effect the court so held. But no demand of payment was made until several days after the sale of the pledge. Of course no court could give its sanction to such an unconscionable act; and it was aptly remarked then that : " In every contract of pledge there is a right of redemption on the part of the debtor. But in this case the right was illusory and of no value if creditors could instantly, without demand of payment and without notice, sell the pledge." The court, however, distinctly recognizes the principle that, where the parties by contract expressly fix the time for the payment of a debt secured by pledge, there no prior demand upon the pledger is necessary. The case of *Brown v. Ward*, 3 Duer 660, only decides that after notes fall due bonds pledged as col-

lateral security may be sold upon giving due notice of the sale to the pledgers.

In *Milliken v. Dehon*, 10 Bosw. 325, direct recognition is given to the doctrine that "all or any of the pawner's rights can be waived or modified by consent, including notice of the time and place of sale," the court remarking: " There is, however, no express waiver of such notice in the case before us." In that instance the sale, a private one, occurred on the 26th day of December, when the sum advanced, $7,000, was not to be re-paid until the 4th day of January following, and a default had not yet occurred in respect to that, so that the sale which took place was not justified on the score of default. The only other ground upon which a sale was by the written agreement authorized to occur was, in the event a decline should occur in the value of the merchandise pledged, and the pledger should " fail whenever demanded to deposit in cash sufficient to cover such decline." But there was no evidence of such demand, and consequently the sale was in direct violation of the express agreement of the pledger. When the case went to the court of appeals, (27 N. Y. 364,) the power to sell given to the pledgee, which was " at public or private sale, or otherwise, at his option, for the most it will bring," was held to be a valid agreement.

In *Markham v. Jaudon*, 41 N. Y. 235, the trial judge had charged the jury that: " In the absence of a special agreement to authorize it, no sale of the stock could be made by the defendants except upon notice given to the plaintiffs of the time and place when the sale would take place," and the verdict was for the plaintiffs and judgment accordingly, which judgment, though reversed by the in- termediate court, was affirmed by the court of appeals. The chief point of defense in that case was, that the sale was made by stock brokers, of stock held by them, in ac- cordance with a usage prevalent in the city of New York, whereby brokers may sell out their customers' stock on exhaustion of the margin ; but such usage was held invalid,

an l that it could not dispense with notice or judicial proceedings. So that case, when narrowly scanned, by no means militates against the doctrine that allows parties to measure, secure, waive or modify their rights by their own special stipulations. A recent text writer recognizes this principle in its fullest extent, saying that it is the settled doctrine of pledges as declared by the courts of New York, that the pledgee can never sell unless there is a waiver, without first calling upon the party, if he is within reach, and requiring him to make his pledge good, &c., * * and that, "Unless there is an agreement to the contrary, the pledgee can never proceed to sell the pledge until default of the pledger," and again, that "if the contract of pledge specifies the time in which the pledge must be redeemed, or in other words, there is an agreement as to the time when the pledge may be sold, upon the expiration of the stipulated time, the pledgee may proceed to make sale of the thing pledged." Tyler on Usury, Pawns and Loans, pp. 582, 594. In the somewhat recent case of *Genet v. Howland*, 45 Barb. 560, the court said: "Excluding the authority contained in that note, the defendant could not have sold the stock without notice of the time and place of sale, and in such case the sale must be public at the time and place mentioned in the notice. But where the parties agree to have the pledge sold at public or private sale, without notice, the party pledging the property cannot insist that he should have notice."

Counsel for plaintiff have cited a very large number of authorities, tending either directly or else by necessary inference, to establish the doctrine that in cases of this sort, the well known maxim "*conventio vincit legem*," is as fully applicable as to any other species of contract whatsoever, and indeed why should it not be so? The doctrine of waiver is one of the most familiar of doctrines; it pervades a very large portion of all human transactions; under its operation rights are lost and rights acquired; titles vested and titles divested; and it would be passing strange

that a doctrine which exerts such a potent and controlling influence in every other species of contract, should be shorn of its customary power when it approaches a contract of bailment; and authorities cited for plaintiff show that, independent of any agreement as to a sale, if a definite time of payment was fixed, the pledge might be sold by the pledgee, without demand or notice. We are well satisfied, therefore, both upon reason and authority, that the public and duly advertised sale of the bonds was a valid one, unless because of further considerations to be now noticed.

But it is with great ingenuity insisted that the sale was invalid for the reason that the date at which the com-

8. PLEDGE.          pany was bound to pay, was fixed, not by the note, but by the maturity of the acceptance; that the note itself was merely collateral security, and delivered as an evidence of the debt. Taking this as true, we do not see that it will alter the attitude of the case. The pledger has said in the note, that " on the non-performance of this promise" the bonds pledged as collateral security might be sold. This, confessedly, must be regarded as fixing the date of the sale, if words are to receive their accustomed import, and we can discover no way to evade their specific force. The fact that the company might avail itself of the letter of credit, as it did do, and draw certain acceptances for the amount of the note, neither destroys nor postpones the date of performance fixed by the note. Nor do we believe, when we come to carefully consider both the note and the agreement, that in reality the parties intended the note as collateral security; for, as has been not inaptly suggested, this involves the novel feature of one collateral being pledged to secure another collateral, and leaves no written evidence of the debt to be secured. Besides, the monthly installments arising from the net earnings of the road were to be credited on the note. Why thus credit them if the note did not evidence and represent the debt, and the indorsements thus made were not intended to show such debt *pro tanto* satisfied? Again, if the parties, as

already seen, could agree upon a definite time, when, upon non-performance, a sale was to occur, would it not clearly rest within their power to contract for a like sale whenever the debt might mature? We see but one answer to this question.

But the further objection is made that this sale of the collaterals was void because made by the pledgers, who became purchasers at their own sale. The general rule, as is well known, is strongly prohibitory of such sales. Story on Bailment, § 319; Tyler on Usury, Pawns and Loans, 604; *Fire Ins Co. v. Dalrymple*, 25 Md. 242; *Blood v. Hayman*, 13 Met. 231; *Bank v. Minot*, 4 Met. 325; Edwards on Bailment, §§ 291, 292; Story Eq. Jur., §§ 321, 322; Hill on Trustees, p. 159; *Thornton v. Irwin*, 43 Mo. 153. The question is, whether the agreement entered into between the parties that the pledgees might thus purchase, shall abate the force of this salutary and equitable rule. There is no doubt that such a sale is not absolutely void, but only voidable, for it may be sanctioned or ratified by consent, and this is shown by numerous authorities. If absolutely void, no title would pass at law, and consequently neither ground nor necessity exists to invoke equitable interposition to declare a nullity null. If voidable, then capable of ratification; if thus capable, then also of prior authorization. Subsequent assent is tantamount to prior authority; "he who may authorize in the beginning, may ratify in the end," (*Bank v. Gay*, 63 Mo. 33; 1 Daniel Negot. Instr., § 316,) and *vice versa*. For these reasons, and those given above, which we deem equally applicable to this branch of the case, we are of opinion that the agreement under consideration must be held valid *in toto*, and the sale made thereunder of equal validity.

We now proceed to consider the title of the plaintiff to the 581 bonds. It would be impossible, in the brief limits allotted to an opinion, to enter into a minute detail of the evidence, as it is very voluminous, oc-

cupying many hundred pages; nor would it serve any useful purpose to do so.   That the court below did not regard these bonds as the valid obligations of the Cairo & Fulton Railroad Company, is shown by its findings and the dismissal of the plaintiff's petition as to them.   After a careful perusal of the evidence, a tangled web of infinite contradictions, we have deemed it best, as much of the testimony was taken orally, and opportunity thus afforded the lower court, which is denied to us, of observing the demeanor of the witnesses, to defer somewhat to that court, and to give its findings our sanction, contenting ourselves with merely giving a brief statement of the reasons which have induced our concurrence in the action of the circuit court.

We regard these bonds as having been fraudulently issued.   After June 13th, 1861, the road was abandoned, the track torn up, the rolling stock disabled and destroyed, and this dismantled condition of the road continued until long after the sale of October 1st, 1866, when the Cairo & Fulton Railroad Company, in consequence of such sale, ceased to exist as a corporation.   *Moore v. Whitcomb*, 48 Mo. 543.   The alleged foundation of the order of June 13th, 1861, whereby $912,000 in bonds of the company were pledged to and placed in possession of Kitchen and the two Bedfords, was the order of March 5th, 1861, which ordered that $20,000 be raised upon personal responsibilty for the purpose of paying the expenses necessary for laying the iron from Sikeston to Little River, and that $900,-000 of the company's bonds be set apart and appropriated for that purpose, as indemnity to the parties who should raise the money.   And the order of June 13th, 1861, is, in its turn, made the basis for the order of September 14th, 1866, which order distributed the bonds of the company between Kitchen, Miller, Poplin, the two Bedfords, Whitcomb, Hill, Crumb and Johnson.   But there is evidence showing that the indebtedness to the Union bank of the State of Missouri, as recited in the last named order, had

no existence, and it is very clearly shown that none of these orders were entered on the books of the company until the fall of 1866, after the road, its property, franchise, &c., had been sold in enforcement of the State's prior lien. The fact that these important entries were made, not contemporaneously with the matters they affect to record, but years afterward, from loose memoranda coming from very questionable sources, is a circumstance in and of itself of very grave suspicion, and when we consider that fact in connection with others, that the alleged indebtedness of $20,000 to the Union bank was of doubtful existence; that those who made the order of March 5th, 1861, were the officers and agents of the company; made it in favor of themselves, and, under the order of June following, divided 912 of the company's bonds amongst themselves, in pledge to secure that alleged indebtedness, and then on September 14th, 1866, just sixteen days before the State sale occurred, several hundred thousand dollars of these bonds were parceled out among these same officers and agents and others, (all of whom had been or were officers of the company at the date of the order,) in payment of their claims at ten cents on the dollar, without inviting competition or making a single attempt to see if a better price could be elsewhere obtained, the grave suspicion first generated in the mind becomes vastly heightened, and it becomes less difficult of belief, that other and lesser items of indebtedness, referred to in general terms in that order, had no more of reality than the larger items of debt just mentioned.

As to the other bonds which go to make up the 581 of plaintiff, the evidence shows, as we think, though on this point there is vexatious conflict, that they also formed a portion of the 912 bonds which were turned over by Brayman in the early part of 1861, unissued, and which remained unissued in the hands of the company or its officers until 1866. As before seen, from June 13th, 1861, no work had been done on the road, no service was performed for and no semblance of vitality existed in the company

except as such semblance was manifested by alleged cor-
porate meetings, hastily and irregularly summoned, where
a quorum of directors was frequently constituted by gra-
tuitous deliveries of stock, and yet on the same day the
order for the division of the bonds was made, thousands of
dollars were allowed against the corporation by the officers
and directors to themselves and those formerly holding
similar official positions; as if seeing the near approach of
the dissolution of the corporation, its officers were deter-
mined not to forget themselves.

Even if the order of June 13th, 1861, by which the
officers and directors of the company pledged to each other
nearly a million dollars in bonds to secure an
indebtedness of less than four per cent of the
face of the collaterals, can be imagined, con-
sidering the great disproportion between the amount of
the debt and the value of the pledge, to have been made
*bona fide*, still the fact that the pledge was made in favor
of themselves, by the fiduciaries of the company's inter-
ests, is enough to cause the order to be scrutinized with the
most rigorous and jealous observation.   A transaction of
this nature is viewed with greater odium than a dealing
between a trustee and his beneficiary.   Some of the au-
thorities go so far as to pronounce it wholly void; as, for
instance, it has been held that a note made by a corpora-
tion to its trustees is against public policy and void.   *Wil-
bur v. Lynde*, 49. Cal. 290; 1 Daniel Negt. Instr., § 282
Other authorities, while not proceeding to this extreme,
still hold that though such a transaction may stand upon
proof of full concurrence and consent of those beneficially
entitled to the property, yet even then the transaction
" will be regarded with great suspicion."   Hill on Trus-
tees, .159.   We discover nothing in the circumstances of
this case which relieves it from the operation of the gen-
eral prohibitory rule forbidding dealings of this sort, or
takes from it that " great suspicion " which equity ever
fastens upon such transactions.   If the order of June 13th,

11. PLEDGE: of cor-
porate assets by
directors to them-
selves.

Chouteau v. Allen.

1861, falls, then that of September 14th, 1866, falls with it. Indeed the latter may be considered as supplemental to the former, and characterized by the same disregard of the company's interests. In view of the foregoing, we are not disposed to hold the pledging and sale of the bonds in question as anything less than actual fraud upon the corporation and its stockholders.

But it is urged that the plaintiff is the innocent purchaser of these bonds, and, therefore, entitled to the usual 12. BONDS, WHEN protection which the law affords to him who NON-NEGOTIABLE. occupies that attitude. The bonds contain this clause:     *     *     "but the company reserve the right to pay the same at any time to be named by them, by adding to the principal a sum equal to twenty per cent. thereof." Any contingency, either as to the amount to be paid, or as to the time when payment is to occur, robs the paper of that certainty which is one of the chief essentials of negotiability. In *Way v. Smith*, 111 Mass. 523, there was a provision in the instrument that : " It is agreed that this note may be paid at any time before maturity, and that interest at the rate of eighteen per cent. per annum shall be deducted till due," and held not negotiable. To the same effect is *Hubbard v. Mosely*, 11 Gray 170. In the present instance, it is obvious that it depends upon the exercise of the reserved option of the maker, when the amount specified in the bond, plus twenty per cent. thereof is to be paid, so that the time of payment depends not upon the face of the paper, but upon the option of the maker. We, therefore, regard the bonds as non-negotiable in form.

But even if the bonds should be held to possess the feature of negotiability, the conclusion to be reached will 13. ── not be changed thereby, and this, for the reason that the bonds had attached to them past due coupons, coupons eight years over due. They must, in consequence, be considered dishonored paper. In the recent case of *Parsons v. Jackson*, 9 Otto Rep. 434, the Supreme Court of the United States said: " The presence of the

past due and unpaid coupons was, of itself, an evidence of dishonor." A similar ruling was also made in Minnesota, the court in regard to the coupons, remarking: "The interest equally with the principal, is a part of the debt which they were intended to secure, and it does not seem to us material whether the whole or only a part of the debt was overdue. When due, the plaintiff had a right of action for the recovery of the interest as for any other installment due on the bond." The same doctrine was announced in *Arents v. Commonwealth*, 18 Gratt. 750; *Newell v. Gregg*, 51 Barb. 263. So that plaintiff should be held to occupy the same position respecting these bonds as his immediate transferrer, and, consequently to take with full notice of all the equities to which the bonds were subject in first hands.

Other circumstances, however, connected with this case will prove of equal efficiency in casting notice upon him. Webber was evidently Chouteau's agent, for he agreed with Chouteau, on the 8th day of December, 1866, to "absorb" for him the outstanding bonds of the Cairo & Fulton Railroad Company at cost, Chouteau furnishing the money, which he did, and the 581 bonds were all purchased through Webber, whose drafts were duly honored. This agreement between Chouteau and Webber was over five months after the road had been extensively advertised for sale by the governor in various newspapers, over three months after the sale of the road, which plaintiff attended as a bidder, and nearly ten months subsequent to the passage of the "sell-out act," of which he admits knowledge, as well as of the governor's advertisement made thereunder. Webber, at the time he bought the bonds for Chouteau, was one of the directors of the company, and had been since March, 1866, and was also one of the commissioners appointed under the "sell-out act," and Bedford, through whom Webber procured the bonds, was the "financial agent" of the company. We cannot, in the light of these and similar facts, presume Webber otherwise than conversant with all that transpired in reference to the bonds

he purchased for his employer. Webber's agency being established, his knowledge acquired not only during the continuance of his agency, but also that possessed by him so shortly prior to his employment, as necessary to give rise to the inference that it remained fixed in his memory when the employment began, must be deemed the knowledge of Chouteau. This principle was recognized in *Hayward v. Ins. Co.*, 52 Mo. 181, though the case was not put upon it. A much broader doctrine respecting the effect of knowledge previously acquired by the agent, is elsewhere announced, (Wade on Notice, § 687,) the merits of which it is unnecessary to discuss.

Another circumstance in this connection not to be ignored is, that the bonds were purchased for less than one-half of the accrued interest. While this inadequacy would not itself be sufficient to charge Chouteau with notice, yet it is a very pregnant fact to be given its due weight in connection with other things, in determining whether Chouteau is to be deemed an innocent purchaser. *Parsons v. Jackson, supra.* Nor is it to be forgotten that these bonds were not purchased in the ordinary routine of commercial transactions, in the customary prosecution of business, but were industriously searched for by Webber, the very accommodating agent who worked for nothing and bore his own expenses.

In relation to the 119 bonds once held by Kitchen, and which formed part of the 581 bonds claimed by plaintiff, 15. STATUTE OF LIMITATIONS: fraud: pleading: pledge. it is asserted that the former held the 119 bonds by force of the statute of limitations. If our position relative to the fraudulent character of the order of June, 1861, be correct, then the statute does not apply. It does not apply, also, because not pleaded. And even were the bonds *bona fide* pledged, the statute would not run while the pledge continued; and any one purchasing or receiving any of the bonds from Kitchen, since the bonds upon their face imparted notice, could take no better title than had Kitchen. Any one, therefore, taking

these bonds, either mediately or immediately, from Kitchen, would take them impressed with the character possessed by them when in Kitchen's hands, whether as pledged, or whether as fraudulently obtained.

For a similar reason the statute respecting fraudulent conveyances is inapplicable. It is well settled that a pawnee can convey no greater right than he himself possesses, and that his assignee stands in his shoes to all intents and purposes. Story on Bailment, § 324; Edwards on Bailments, 69.

16. PLEDGE: assignment by pledgee.

Kitchen certainly would not be permitted, did he still retain possession of the bonds, to shelter himself behind either of the statutory provisions above mentioned; and the ostensible purchaser from him, warned as he was by the faces of the bonds, of all the equities which had attached to them in consequence of the fraud committed, ought not in equity and good conscience to occupy a more advantageous position, or possess a higher claim to equitable relief. In short, Chouteau comes into court with hands no cleaner than those from whom he bought, and a court of equity might even concede the operation of the statutory provisions to be as plaintiff claims, and still refusing its aid, leave him where it finds him.

But it is said that no matter what the circumstances under which the bonds were acquired, Allen has shown no such interest as entitles him to defend in this proceeding. That he is owner of the capital stock once held by Scott county, is shown by the conveyance of that stock to him by that county, through its commissioner, Rhoads. That there is no evidence showing compliance with the conditions upon which the conveyance was made, is altogether immaterial. Allen's title to the stock will remain until advantage be taken, by the proper party, of conditions broken. The ownership of this stock, as well as that of the Congress lands, is sufficient to give him a standing in court, and renders discussion as to

17. PARTIES: corporation: mortgage.

his acquisition of the stock of other counties unnecessary at present.

It is also said that there has been such delay, such acquiescence, on the part of the corporation and stock-holders, in respect to the pledging and sub-sequent sale of the bonds, as to entirely preclude those interested from averring aught against the validity of the bonds. It is not to be denied that laches and acquiescence will cure an otherwise unauthorized act; this we have already announced in a former part of this opinion. But we scarcely think those remarks applicable in respect to the pledging and issuance of the bonds, and for these reasons: After June, 1861, on the 13th of which month the order to pledge the bonds was made, which order, as before seen, was never placed upon record till the fall of 1866, the road was dismantled and abandoned, and so far as further work was concerned, the company prac-tically ceased to exist. Then the war, with all its attend-ant confusion, raged for four years, and though corporate meetings were held, no publicity was given them, and no public record of such meetings kept, to which the stock-holders could have had access. Then the order of Sep-tember 14th, 1866, was made, but not entered of record, selling the bonds to the officers and directors, and then in about a fortnight thereafter the State sale occurred, which accomplished, as a matter of law, the destruction of the company, and doubtless in popular opinion, destroyed, as a matter of fact, all the rights dependent upon a continu-ance of that organization. In addition thereto, although under the statute, the president and directors are made the trustees of a dissolved corporation to settle its affairs, sue for and recover its debts, property, &c.. (Wag. Stat., § 21, p. 293; *Kansas City Hotel Co. v. Sauer*, 65 Mo. 279;) yet those who, on the 14th day of September, 1866, professedly occupied those official positions appear never to have acted as trustees; on the contrary, we find them, by their answer refusing to act in that capacity, and by that answer deny-

18. NO LACHES OR ACQUIESCENCE.

ing that they, at the time of the State sale, occupied any official position in the company. This being the case, it would certainly seem a hardship too great to be tolerated, to impute laches to counties and others beneficially interested, and let them suffer under such circumstances, when abandoned and betrayed by their official protectors, their wrongs unsuspected, their rights unknown, and when nothing short of extraordinary vigilance could have secured redress of the one and recognition of the other. We, therefore, hold no laches or acquiescence imputable to the stockholders or corporation in the present instance.

There is no occasion to discuss the nature of certain titles of Allen to the swamp lands by reason of certain conveyances to him, as whatever of validity they may possess must be subordinate to the deeds of trust.

It was erroneous to enter judgment in favor of plaintiff as pledgee for the amount of the $12,000 note and interest, and that judgment must be reversed. He had sued as owner of the 125 bonds, and, therefore, was entitled to recover only in that capacity. When the lower court becomes again possessed of this cause, judgment in favor of plaintiff, to be satisfied out of the swamp lands, will be entered in accordance with this opinion, for the amount of the 125 bonds, with accrued coupons, up to the date of such judgment; the remaining coupons, falling due after such date, will be canceled.

19. FORECLOSURE OF MORTGAGE: practice and pleading.

For the reason just announced, the judgment in favor of defendants Moore and Bridges, administrator of Patterson, as pledgees, was erroneous. Since they claimed as owners, and not otherwise, and consequently could only recover in conformity with their pleadings, that judgment must also be reversed; and the same remarks are applicable here as were to the Schuschardt & Gebhardt bonds, because a power to sell the bonds, was in this instance, also, conferred by Brayman upon Whitcomb and Moore, and default having been made in the payment of the note, the

bonds were sold in conformity to the terms of the instrument. Upon return of this cause, the court below will allow a recovery for the amount of the bonds and coupons, diminished by whatever amount Whitcomb and Moore may have received from the company, and if necessary, have an accounting to ascertain such amount.

The judgment against the defendant Hill must be affirmed, and this regardless of the merits, as his motion for new trial was not filed within the time prescribed by law.

We also affirm the judgment against defendant Clarkson, thinking that he established no right of recovery. He was the pledgee of a bond given to secure a note, executed by the company and Sexton, for the right of way through the pledgee's land. Suit was brought on this note and judgment recovered, a transcript of the judgment sent to Chicago, judgment recovered against Sexton's estate, and judgment, less $100, paid to Clarkson's attorneys in satisfaction of his claim. In addition to that, he afterwards sued out execution in Mississippi county, levied upon, sold and bought in the very right of way for which the note was given, and also the bond itself. We feel no hesitancy, therefore, in affirming the judgment which went against him.

In relation to the 51 bonds claimed by Seelye: the judgment in his favor as to one of the bonds, and several of the coupons, deeming it correct, we affirm.

I regard the judgment of the circuit court correct, also, as to the remaining 50 bonds, and for these reasons: The statute, (1 R. S. 1855, p. 438, § 53,) made it a felony for any person whilst a director, engineer, clerk, secretary, treasurer, or any other officer, agent, employee or servant, of any railroad company, to either directly or indirectly be a contractor, or directly or indirectly receive any profits, portions, proceeds, commissions or charges, whatever, of any contractor, on account of any contract for the construction, building, grading or repairing of any railroad belonging to such company. And the next section, 59,

made all contracts of any kind or for any purpose whatever made in violation of any of the provisions of this act, "absolutely null and void, and incapable of being enforced in any court in this State."

The testimony showed to the satisfaction of the circuit court, and but little reason is discovered to doubt the correctness of its conclusions, that in the contract made, nominally between Hamilton and the railroad company, Sexton, the vice-president and a director of the company, was, if not the real party in interest, interested largely in the contract, and Brayman, the president, was also interested. If this was the case, then, according to the express statutory provisions, the contract is null and incapable of enforcement. It will not do to say this is not a suit upon the construction contract; this may be true, but it is a suit upon the written promises of the company, and the consideration of those promises is, in part, at least, illegal, based, in part, at least, upon a consideration which the law will not recognize. Mr. Justice Story says: "When the consideration is illegal in part, then it avoids the note *in toto*," (Story Prom. Notes, § 190,) and the same learned author says elsewhere, that the consideration of a note will be illegal either because against the general principles and doctrines of the common law, or because specially prohibited by statute. Id., 189  Language could scarcely be more thoroughly prohibitory of any given act than that of the statute above quoted, and if it would not apply to a case of this sort, it would seem difficult to imagine one where it would apply. If it does apply, then of necessity, the consideration of the bonds being illegal, no recovery can be had upon them, unless, indeed, we are prepared to turn our backs upon the statutes. And it is a matter of no moment that the bonds bear a date anterior to that of the construction contract; otherwise, the provisions of the statute could be easily evaded by simply antedating the written security based upon the illegal consideration. A similar point was so ruled in *Williams v. Wall*, 60 Mo. 318.

Nor is the objection well taken that the statute under discussion is not applicable to the Cairo & Fulton Railroad Company. The language of section 60* is comprehensive enough to embrace not only companies for which the credit of the State was "engaged" at the time of the passage of the act, but also any company for which the credit of the State might, in the future, be engaged; so that whenever the State engaged its credit in favor of a railroad corporation, then the statute would spring into operative existence and interdict the making of a certain class of contracts. Besides, the State's credit, in the present instance, had been "engaged" in favor of the Cairo & Fulton Railroad Company in 1857, long before the contract in question was entered into. As before seen, the bonds not being in form negotiable, and having past due coupons attached to them, Seelye took them with all their antecedent infirmities clinging to them, and is consequently in no better situation to maintain suit on them than would be the original parties.

But it is strenuously asserted that the claim of Hamilton against the railroad company, even if illegal, has been "adjusted" and purged of its illegality in consequence of the bonds having been received by him of the company. I do not take this view, for the bonds were merely the promises of the company to pay; and the question of illegality of consideration could be raised at any time prior to payment, as much so as if the bonds had been given for a gaming or other illegal consideration. For these reasons I am of opinion, in which Judge NORTON concurs, that the judgment of the circuit court, as to the remaining 50 bonds, should be affirmed. The majority of this court are, however, of a different opinion, and in consequence, the judgment as to those bonds must be reversed, and on return of

---

*Section 60 reads as follows: "The provisions of the last two sections shall apply only to railroad corporations and companies for which the credit of the State is, by some act of the Legislature, in some way engaged."

this cause judgment in favor of Seelye will be entered as
to those bonds also.

In regard to that portion of the judgment respecting
the 581 bonds, and which went against the plaintiff, we
affirm the same, and remand this cause to be proceeded
with as herein indicated. All concur.

HENRY, J.—I concur in the foregoing opinion, except
that portion relating to the Seelye bonds. By section 58
of the corporation act, (R. S. 1855, p. 438,)
if any officer or agent, employee or servant
of a railroad company shall, directly or in-
directly, be a contractor, or shall receive any profits or
proceeds of any contractor, on account of any contract for
the grading or repairing of any railroad belonging to such
corporation, he is declared guilty of a felony, and punish-
able by imprisonment in the penitentiary. Section 59 de-
clares every person having a contract, or any interest in a
contract, as specified in the preceding section, to be *ipso
facto* ineligible to be a director or engineer, or to fill any
other office or place of trust and profit in the employ of or
for any company or corporation, owning or having super-
vision of such road; and also provides that all contracts
made by the directors of any such company or corpora-
tion, containing any such person in its board as a director,
and all contracts of any kind, or for any purpose whatever,
made and entered into in violation of any provision of the
act, shall be absolutely null and void, and incapable of en-
forcement in any court of this State.

Section 58 denounces no contract, but one by which
an officer or employee of the company becomes a party to
or a participant in the profits or proceeds of a contract for
the construction, building, grading or repairing of the road.
Here Hamilton was the contractor. Sexton and Brayman
were not parties to Hamilton's contract with the company.
The agreement by which they were to have an interest in
that contract was collateral to it; and while they might

have been prosecuted for a felony, and were incapable of enforcing their agreement, the fact that such a contract was entered into by Hamilton with them, did not invalidate his construction contract with the company. It will not be denied that Hamilton's contract with the company would have been valid if he had not made the alleged contract with Sexton and Brayman. There is nothing in the statute expressly declaring that Hamilton shall forfeit all rights under that contract if he make an agreement by which a director, or other officer of the company, shall become interested with him. Admitting that before he made the contract with the company to build the road, he had agreed with Sexton and Brayman that they should participate in the profits of the contract which he might make with the company, it is the same as if the contract with Sexton and Brayman had been made after the construction contract had been entered into, so far as the validity of the latter is concerned. The statute does not declare that a director, or other officer, who contracts for a portion of the profits, shall be guilty of a felony; but it is the making of a contract with the company or the receipt of profits, portions, proceeds, commissions or charges from a contractor which constitutes the offense. Section 58 defines a criminal offense, nothing more. If an officer or employee be a party to a contract with the company, he violates that section, but if he only enters into a contract for the receipt of profits, portions, proceeds, &c., of a construction contract made by another party, he is guilty of no crime, unless, under this contract, he actually receives profits, &c. An indictment under that section against Sexton or Brayman would allege the contract between Hamilton and the company merely as inducement, and that the accused feloniously received profits, &c., of the contractor, or in the other aspect of the case, that Sexton and Brayman were parties to the contract made by Hamilton with the company.

The first clause of section 59 declares ineligible as a

director, engineer, &c., any one having a contract or inter-est in a contract, as specified in section 58 ; and the second clause makes null and void all contracts made by the di-rectory of any such company or corporation containing any such person in the board as a director. The contracts mentioned in that portion of the second clause, are other contracts than those forbidden in section 58, which make the person ineligible to be a director. By said second clause, also, all contracts of any kind, made in violation of any provision of the act, are declared null and void. The contracts for which an officer of the road is made guilty of a felony, if he be a party to them, would have been void without the 59th section, as would any contract entered into by an officer for the receipt of moneys which he is forbidden to receive by that section, and declared a felon if he do receive them. These two are the only sections of the act having any bearing on the questions we are consid-ering. The 58th section uses phraseology which obscures the sense of the section. It prohibits the person therein named from becoming " directly or indirectly " contractors, or from, directly or indirectly, receiving any profits, pro-ceeds, &c., of any contract for the construction, building, grading or repairing, &c. We cannot comprehend how one can be indirectly a contractor, except by directly or indi-rectly sharing in the profits, &c., with a party or parties who are contractors. But that the General Assembly did not understand that a mere participation in the profits would make a person either directly or indirectly a con-tractor, is evident from an obvious recognition in the sec-tion of a distinction. A person could not, at the same time, be a contractor and subject to indictment for so be-ing, and by the very same contract or agreement a mere recipient of profits, &., under the second clause of section 58. The contract between Hamilton and the company cannot be void, as made by the company while a member or members of the directory were concerned in that con-tract, because it had to be made before Sexton and Bray-

man could receive any money under it. When Hamilton's contract was made, these directors had no interest in a contract which Hamilton had with the company. A contract before that time between them and Hamilton, by which they were to have a share of the profits, &c., of the contract he might make with the company, if it did not make them co-contractors, could have had no effect whatever upon Hamilton's contract with the company. It is a collateral contract to Hamilton's construction contract, and its validity is determined by section 58. The construction of section 59, contended for by defendant's counsel, makes all contracts entered into with the directory containing a member who had violated section 58, null and void, although the other members were ignorant of the violation of that contract by such director, and although the subsequent contracts have no connection whatever with that to which such director's contract may relate.

If such a construction is to prevail, no one would be safe in making a contract with a railroad company, for the most diligent inquiry to ascertain if any director had been guilty of a violation of section 58 would most probably be unavailing, as a director concerned in a contract in disregard of that section, would be interested and anxious to conceal it to avoid a criminal prosecution. So if the construction of the two sections prevails, which our associates favor, then not only is Hamilton's contract void, but all sub-contracts made by him, and all contracts made by such sub-contractors with teamsters and day-laborers are also null and void. A construction of these sections which would work such manifest injustice in hundreds of cases which might be supposed, in addition to those already suggested, should not be adopted, unless it be clearly indicated by their phraseology. The express terms of the statute, as we have seen, do not declare, nor is it a necessary implication from any words employed in either section, or demanded by the spirit and purpose of the act, that any contract shall be affected by the provisions of those sec-

tions, except the very contract named therein, and for entering into which the officer or employee is indictable for a felony. It forbids an officer from being a contractor with the company, or receiving any proceeds of a contract of another, and avoids all such contracts made by the officer. This is the scope and meaning of the two sections, we think; and as a contract to share in the profits of another who has a construction contract, does not make the officer a contractor with the company, it is only null and void under other provisions of the sections, and would have been if not declared so by the statute, because a contract to receive what the officer would have been guilty of a felony for receiving; but it has no effect upon that other contract.

But conceding that Hamilton's construction contract was tainted with illegality and void, because Sexton and Brayman had an interest, yet these bonds were not made in furtherance of that contract, or in compliance with any of its provisions, but were made to be used by the company as occasion might require, and after the completion of the work by Hamilton, under his contract, were delivered to him in payment therefor. The consideration for this transfer was neither immoral nor illegal. As the work done by Hamilton could not be returned to him, and was valuable to the company, there was a moral obligation resting upon it to pay Hamilton its value, notwithstanding the original contract under which that work was done could not be enforced. There being a valid consideration to support the promise contained in the bonds, and it being unnecessary for Seelye, in making out his case, to rely upon the illegal contract with Hamilton, his right to recover cannot be successfully questioned. *Gwinn v. Simes,* 61 Mo. 335; *Buck v. Albee,* 26 Vt. 184; *Thomas v. Brady,* 10 Barr 164; *Scott v. Duffey,* 14 Pa. St. 18; *Lestapies v. Ingraham,* 5 Pa. St. 81. The judgment of the circuit court is reversed and the cause remanded, to be proceeded with as heretofore directed. NAPTON and HOUGH, JJ., concur.

21. BONDS; illegal contract.

*On Motion for Rehearing.*

SHERWOOD, C. J.—We shall decline any further discussion as to the Seelye bonds, as a majority of the judges **2. FORECLOSURE OF MORTGAGE: jurisdiction.** remain as to them of their original opinion. Nor shall we enter upon any discussion respecting the legality of certain stock subscriptions made by counties to the capital stock of the Cairo & Fulton Railroad Company, because not at all necessary to a proper determination of this case. It only remains to consider the question of jurisdiction. The statute provides that in suits for the foreclosure of mortgages of real estate, "the petition may be filed in any county where any part of the mortgaged premises is situated." 2 Wag. Stat., § 3, p. 954. The statutory provision in respect to personal actions is more emphatic, requiring that "suits instituted by summons, shall, except as otherwise provided by law, be brought: First, When the defendant is a resident of the State, either in the county within which the defendant resides, or in the county within which the plaintiff resides, and the defendant may be found," and yet it was held in reference to this statute, in the case of *Hembree v. Campbell*, 8 Mo. 572, that though the suit was brought in the county in which the plaintiff resided, and service had upon the defendant in the county of his residence, unless a plea in abatement to the jurisdiction of the court over the person of the defendant, was interposed in the first instance, the objection on the score of lack of jurisdiction could not subsequently be successfully raised. And this, upon the generally recognized ground that the court had jurisdiction over the subject matter of the suit, and that the defendant's plea to the merits acknowledged jurisdiction over his person, and precluded objection on account of absence of regularity in the instituting of the action. So, also, in *Ulrici v. Papin*, 11 Mo. 42, where the then existing statute required "suits in equity concerning real estate, or whereby the same may be affected, shall be brought in the county within which such real estate or a greater part thereof is

23—70

situate," and by demurrer to the bill it was objected that the suit was not brought in the proper county in conformity with the statutory provision, Judge Scott remarked: " That it does not clearly appear where the greater part of the lands lie. This objection, if tenable, should have been raised by a plea to the jurisdiction." And the same learned judge remarks, in *Hembree v. Campbell, supra*, " No principle is better established than that a plea in bar is a waiver of all dilatory matter of defense. That the matter of abatement was apparent upon the writ can make no difference. Such matters are and should be pleaded." And pleas to the jurisdiction are as necessary in local as in transitory actions. 1 Tidd Prac., 630.

It is not meant to convey the idea that the mere failure to plead to the jurisdiction of the court would have the effect to confer jurisdiction where none existed before; for it is well settled that even consent of parties cannot confer jurisdiction. *Stone v. Corbett*, 20 Mo. 350. But all circuit courts have a general jurisdiction over the foreclosure of mortgages. This is proven by the fact that changes of venue may be taken by consent of parties to distant counties and circuits in the prosecution of foreclosure proceedings, as well as in other suits. 2 Wag. Stat., § 4, p. 1005. That the circuit court of Mississippi county was of opinion it had cognizance of the cause, is conclusively shown by the fact that it proceeded to judgment therein. As was said in a somewhat analogous case, the holding cognizance of the cause was a "judicial assertion" of the right so to do. *Bouldin v. Ewart*, 63 Mo. 330. After a court, which has general jurisdiction over a certain class of causes, proceeds without objection to the hearing and determination of a cause belonging to that class, it is quite too late in this court to raise objections to the irregular exercise of such jurisdiction; such objections, even if originally valid, lose their force when waived by pleading to the merits. And we can discover no difference in princi-

ple between this case and that of *Hembree v. Campbell, supra.* The motion for rehearing, is, therefore, overruled. All concur.